CONTINENTAL STEEL CORP., et al., Plaintiffs,

v.

UNITED STATES, Defendant.

AMAX CHEMICAL, INC. and Kerr-McGee Chemical Corp., Plaintiffs,

v.

UNITED STATES, Defendant.

Court No. 84–05–00728.

United States Court of International Trade.

July 30, 1985.

Wiley & Rein, Washington, D.C. (Charles Owen Verrill, Jr., James M. Johnstone, Robert E. Nielsen and William B. Baker, Washington, D.C.), for plaintiffs Continental Steel Corp., Georgetown Steel Corp. and Raritan River Steel Co.

Fried, Frank, Harris, Shriver & Kampelman, Washington, D.C. (David E. Birenbaum and Alan G. Kashdan, Washington, D.C.), for plaintiff Atlantic Steel Co.

Drinker, Biddle & Reath, Washington, D.C. (W.N. Harrell Smith, Washington, D.C., and James S. Gkonos) for plaintiffs Amax Chemical, Inc. and Kerr-McGee Chemical Corp.

Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Washington, D.C. (Kevin C. Kennedy, Washington, D.C.), for defendant.

Wilmer, Cutler & Pickering, Washington, D.C., (C. Loring Jetton, Jr., John D. Greenwald, Deborah M. Levy, and Stephen J. Schnably, Washington, D.C.), for amicus curiae, American Textile Manufacturers Institute.

### Opinion and Order

WATSON, Judge:

These consolidated actions were brought to challenge the conclusion of the International Trade Administration of the Department of Commerce (Commerce) that, as a matter of law, subsidies cannot be found in countries which have nonmarket economies.

In two countervailing duty investigations the challenged conclusion led Commerce to reach final determinations that manufacturers, producers, or exporters of carbon steel wire rod in Czechoslovakia and Poland were not receiving subsidies.[1] The same reasoning led Commerce to rescind the investigations into whether potassium chloride (potash) from the Soviet Union and the German Democratic Republic was being subsidized on the ground that the petitions did not allege the elements necessary for the imposition of countervailing duties.[2]

The Commerce Department defines a nonmarket economy as one which operates on principles of nonmarket cost or pricing structures so that sales or offers for sale of merchandise in that country, or to other countries, do not reflect the market value of the merchandise. In short, a nonmarket economy is said to be one in which the price of merchandise does not normally reflect its market value.

In the determinations in dispute the existence of nonmarket economies was found to be evidenced by central government control of prices, central government control of the allocation of resources and, in the case of the Soviet Union and the German Democratic Republic, extremely limited convertibility of the national currency.

The Commerce Department reasoning had four parts: First, it said that government activity in a nonmarket economy cannot confer a subsidy because a subsidy, *by definition*, means an act which distorts the operation of a *market*. In other words, for a subsidy to exist there must be a free market to provide an independent, essential reference point or benchmark for measuring whatever is allegedly a "subsidy" to a particular enterprise. Without the uncontrolled market there can be no subsidization.

Second, Commerce said that Congress has never confronted the question of whether the countervailing duty law applies to countries with nonmarket economies. Further, that this "silence," com-

---

1. Carbon Steel Wire Rod from Czechoslovakia, Final Negative Countervailing Duty Determination, 49 Fed.Reg. 19,370 (May 7, 1984); Carbon Steel Wire Rod from Poland; Final Negative

Countervailing Duty Determination, 49 Fed.Reg. 19,374 (May 7, 1984).

2. 49 Fed.Reg. 23428–23429 (June 6, 1984).

bined with Congressional refinement and development of legal remedies other than the countervailing duty law for use with products from nonmarket economies, leaves the agency in the position of trying to determine what Congress would have done in this situation.

Third, the agency stated that the consensus of opinion in academic literature was that the countervailing duty law cannot be applied to countries with nonmarket economies.

Finally, the agency asserted a broad discretion to determine the existence or non-existence of subsidies.

The plaintiffs have attacked the Commerce Department determinations as contrary to the plain meaning of the law, inconsistent with judicial interpretation and without support in legislative history.

The Court is of the opinion that the Commerce Department has made a basic error in its interpretation and administration of this law. The fundamental error of the Commerce Department is its premise that a subsidy can only exist in a market economy. Stated differently, it is completely at variance with the law to find that the acts at which the countervailing duty law was aimed, do not include the acts of a government of a country with a nonmarket economy.

It should be noted that these proceedings were governed by the countervailing duty law contained in 19 U.S.C. § 1303 because the countries producing the products which were the subject of these petitions were not countries "under the Agreement" within the meaning of 19 U.S.C. § 1671(b). This meant only that the assessment of countervailing duties would not require an injury determination if a "bounty" or "grant" was found to exist. In all other respects the language of both countervailing duty laws forms a seamless web and the terminology is used interchangeably.

The position taken by Commerce is at odds with the plain meaning and purpose of the law. It contradicts judicial interpretations of the law. It is inconsistent with past administration of the law. It also appears to be self-contradictory from its inception.

Taking the last point first, it appears that the Commerce Department recognizes that the countervailing duty law covers "any country," and does not allow *per se* exemptions from the law for any political entity. Nevertheless, Commerce goes on to posit what it calls an "additional jurisdictional question," namely, whether government activities in a nonmarket economy can confer a "bounty or grant" within the meaning of the law. If this was truly a "jurisdictional" question, a failure to meet the jurisdictional criteria of the law would indeed deprive the agency of authority to enforce the law beyond the determination of that point. That *would* amount to a *per se* exemption from the law (which Commerce claims it is not making) and would be in conflict with the plain statement that the law covers *any* country.

It should be obvious that the question of whether any country is bestowing a bounty or grant or a subsidy is the ultimate question on the *merits* of a petition. It is not a question which must first be answered in order to decide whether to initiate an investigation. Nor is it a question which can be answered in advance and in the abstract for countries with certain types of economies.

The simple fact is that the countervailing duty law makes no distinctions based on the form of any country's economy. Its language and purpose allow no such distinctions to be made.

The language of the law is so abundantly clear and its purpose so obvious that there is a danger of moving on too quickly to the complicated theoretical underpinnings of the determinations and, by sheer length of discussion, give them a weight which they do not deserve. Consequently, it is important to follow the basic principle, repeatedly stressed by the Supreme Court, that "in determining the scope of a statute, one is to look first at its language." *North Dakota v. United States*, 460 U.S. 300, 312, 103 S.Ct. 1095, 1102, 75 L.Ed.2d 77 (1983).

The relevant language of the countervailing duty law, in 19 U.S.C. § 1303, reads as follows:

... Whenever any country, dependency, colony, province, or other political subdivision of government, person, partnership, association, cartel, or corporation, shall pay or bestow, directly or indirectly, any bounty or grant upon the manufacture or production or export of any article of merchandise manufactured or produced in such country, dependency, colony, province, or other political subdivision of government, then upon the importation of such article or merchandise into the United States, whether the same shall be imported directly from the country of production or otherwise, and whether such article or merchandise is imported in the same condition as when exported from the country of production or has been changed in condition by re-manufacture or otherwise, there shall be levied and paid, in all such cases, in addition to any duties otherwise imposed, a duty equal to the net amount of such bounty or grant, however the same be paid or bestowed.

The Supreme Court has also said that, absent a clearly expressed legislative intention to the contrary, the language of a statute "must ordinarily be regarded as conclusive." *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).

It would be difficult to conceive of statutory language which would be more comprehensive than the language of the countervailing duty law. It would be hard to write a law which would be more antagonistic to the making of artificial distinctions. On its face, the law shows a meticulous inclusiveness and an unswerving intention to cover all possible variations of the acts sought to be counterbalanced.

In the opinion of the Court the language of this law is perfectly indifferent to forms of economy. The language plainly shows the strongest possible desire to prevent evasion either by means of technicalities of status, or by technicalities of form, or by technicalities of relationship.

We have a law which uses ten exhaustive alternatives to describe the possible conveyor of the subsidy. As an alternative to "pay," which conceivably might be avoided by some other form of conveyance, it uses the general term "bestow." It specifically seeks out benefits given "directly or indirectly." The law takes pains to cover manufacture, production or export lest artificial distinctions be developed between levels of commercial activity. It goes on to specify that it controls in all conceivable methods of importation, whether the article in question is imported into the United States directly or otherwise and whether or not the article is changed in condition by re-manufacture or otherwise.

In the midst of this formidable demonstration of careful draftsmanship the law describes the fundamental thing which is paid or bestowed as "any bounty or grant."

The Supreme Court has stated that "a word of broader significance than 'grant' could not have been used." *Nicholas & Co. v. United States,* 249 U.S. 34, 39, 39 S.Ct. 218, 220, 63 L.Ed. 461 (1919).

The use of the broadest possible language clearly demonstrates an intent to cover as many beneficial acts as possible. Justice Frankfurter has stated that the purpose of a law is often imbedded in the statute even if specific manifestations are not thought of, and that is "often the very reason for casting a statute in very general terms." F. Frankfurter, *Some Reflections on the Reading of Statutes,* reprinted in *Sutherland Statutory Construction,* Vol. 3, p. 423 (4th ed., 1972).

It should be noted at this point that the term "subsidy," which is now used in the law, has been explicitly stated by Congress to have "the same meaning as the term 'bounty or grant' as that term is used in section 303 of this Act [19 U.S.C. § 1303]...." This means that the broadness of language and spirit has been carried forward without being diminished. The terms can be used interchangeably

with no difference in meaning, and are so used in this opinion.

Here we have a law written with great care to apply to all countries, using words of the broadest possible significance to describe the conduct whose effect it seeks to neutralize.

We have petitions which allege the existence of government programs in the countries involved which, in the abstract, would normally encourage the exportation of merchandise. These include providing a beneficial rate of currency exchange to the exporter, allowing exporting companies to keep a portion of the hard currency earned from their exports and providing tax exemptions based on export performance.

Against this formidable background the Court is asked to approve a monumental exception to the law, an exception which is based on nothing more than certain general economic characteristics attributed to the countries whose products are the subject of petitions.

In this context common sense is offended by a preemptive conclusion that subsidization is not possible because of some general economic characteristics of the exporting country. To avoid the overwhelming indications that the law be applied to *all* countries in *all* cases there would have to be some definitive exception for countries with nonmarket economies. This would be a major exemption from a remedial law and it should not be recognized unless it has been unequivocally made. *Abbott Labs v. Portland Retail Druggists*, 425 U.S. 1, 11, 12, 96 S.Ct. 1305, 1313, 1313, 47 L.Ed.2d 537 (1976).

With this in mind, the shortcomings of the administrative determinations are evident.

To be blunt, the Commerce Department determination attempts to amend the countervailing duty law. It passes over the plain meaning and manifest purpose of the law to institute, by administrative fiat, a major exception for countries with nonmarket economies. It does so by means of

3. 49 Fed.Reg. 19373, 19374; 49 Fed.Reg. 19377.

a redefinition of the term "subsidy". The redefinition is not in accordance with the language of the law and it is irrational and arbitrary.

The Commerce Department defines a subsidy as a distortion of the operation of a *market* economy. This is a novel definition. It depends on the premise that only in a market economy can a "distortion" exist because only in such an economy can the alleged subsidy be measured against what the normal or benchmark level of that particular element would be. This in turn presumes that there is no normality or "measurability" in a nonmarket economy, i.e., that central control makes any given economic decision unpredictable or atypical or irrational, so that one act cannot be characterized as more beneficial than another. Into this picture of economic irrationality the Commerce Department adds the additional fillip that even if "incentives" to production do exist in a nonmarket economy they are not beneficial in our sense of the word. They are assertedly some sort of ineffectual attempt to exercise control. They do not actually result in subsidization because the firms, lacking a profit motive and subject to centralized export controls, cannot respond to the incentives.

The determinations state that "even those incentives tied to export, some of which might be considered export subsidies in a market economy, do not, in our opinion, operate as export subsidies in an NME." [3]

This line of analytical legerdemain is developed as follows:

That the Czech government has introduced "economic mechanisms,"—for rewarding overfulfillment of targets, for rationalizing the use of imports, for promoting exports—does not mean that Czech enterprises can respond to those incentives like a competitive firm in a market economy. These mechanisms are imposed upon a system that is not economically rational. Nor are the reforms

designed to lead to a rational, market system. Central planning remains the basis for defining the goals and operating conditions for the enterprises.

In this situation, "incentives" have a different meaning than in a market economy system. They are not distortions of market generated signals to competitive firms. They are imposed on a system to generate results: results that the nonmarket economy inherently cannot produce.[4]

The quoted passages are amalgams of economic jargon, semantic arbitrariness and unlawful irrationality. Decisions which depend on a premise that economic conduct is irrational or inherently ineffectual cannot be allowed. Economic behavior may be one of the few areas in which rationality and effectiveness can still be presumed in world affairs. Laws cannot be enforced if conduct to which they are directed is not taken at face value. The enforcement of laws requires the investigation of reality, not the formulation of theoretical obstacles.

Subsidization in one of its purest forms is the encouragement of exportation by means of some type of special preference.

The Commerce Department cannot say that such a preference is impossible in a nonmarket economy. It can only say that distortions of a "market" are not possible. This may be true but it does not eliminate the possibility of subsidization.

The Commerce Department reasoning suggests the absurd result that the more completely a government becomes involved in production and the more thoroughly it eliminates the possibility of internal reference to "market;" in short, the more perfectly it insulates production from normal economic reality the less likely it is to be "subsidizing."

Furthermore, there is no reason why this logic must be limited to nonmarket economies. A market economy government can conceivably eliminate the market context for the resources used by an industry it chooses to aid by totally controlling the production and sale of some important raw materials. Does it thereby eliminate the possibility of subsidization?

The Commerce Department's definition of subsidy includes language stating that a subsidy "results in a misallocation of resources, encouraging inefficient production and lessening world wealth."[5]

There is not the slightest indication in the law or the legislative history to show that the allocation of resources, the efficiency of production or the diminution of world wealth is a concern of the countervailing duty law.

The Commerce Department's definition sounds as if the countervailing duty law is being viewed as a means for influencing the way the wealth of the world is developed or the way other countries choose to allocate resources or organize production. This would be totally improper, and would be a dangerous distortion of the law. The countervailing duty law is not a tool of foreign policy.

The only purpose of the countervailing duty law is to extract the subsidies contained in merchandise entering the commerce of the United States in order to protect domestic industry from their effect. In this domestic purpose, its effectiveness is clearly intended to be complete and without exception.

The great irony of the Commerce Department's approach is that while it gives the countervailing duty law a grandiose, theoretical objective, it destroys a significant part of its practical domestic purpose.

The practical domestic purpose of the law is what must control. That purpose is plain. The Supreme Court has stated that this law "has no uncertainty of purpose." *Nicholas & Co. v. United States,* 249 U.S. 34, 39, 39 S.Ct. 218, 220, 63 L.Ed. 461 (1919). Congress has characterized the purpose as "assuring effective protection of domestic interests from foreign subsi-

---

**4.** 49 Fed.Reg. 19373.

**5.** 49 Fed.Reg. 19372, 19375.

dies ...." S.Rep. No. 93–1298, 93d Cong., 2d Sess. 183 (1974), U.S.Code Cong. & Admin.News 1974, pp. 7186, 7318. In conformity with this purpose the Courts have refused to allow narrow or restricted administrative interpretations to weaken the terms "bounty" or "grant." *ASG Industries, Inc. v. United States*, 67 C.C.P.A. 11, 18, C.A.D. 1237, 610 F.2d 770, 776 (1979). See also *ASG Industries, Inc. v. United States*, 82 Cust.Ct. 101, C.D. 4794, 467 F.Supp. 1200 (1979) (appeal dismissed). The purpose of the law does not allow distinctions or general exceptions based on the form of a country's economy. It requires enforcement of the law to the full extent of the agency's authority and ability.

The administrative determinations under review here also suggest that the concept of subsidy can have no meaning in a nonmarket economy because *everything* would become "subsidized." The Commerce department says that "to impose that concept where it has no meaning would force us to identify every government action as a subsidy...."[6]

The term "subsidy" as it applies in the export activity of a nonmarket economy does not present any real difficulties of "meaning." The subsidies alleged to exist here are not acts which are peculiar to nonmarket economies. If there are any difficulties here, they are not difficulties of *meaning*, but problems of *measurement*, which are precisely within the expertise of the agency.

Even if we anticipate problems of meaning in the event that more problematic domestic conduct of these countries becomes subject to scrutiny, it cannot be accepted that this arises from a congenital subsidizing character of all government acts in a nonmarket economy. In other words, it cannot be assumed that central economic control is synonymous with subsidization. This goes back to the fundamental misconception that it takes distortion of a "market" to make a subsidy.

The concept of subsidization is really much broader than that. If it has to be stated in terms of distortion then it is a distortion of a pattern of regularity or even a pattern of reasonably expected fairness. But these subtleties can be left for the future. For the moment, it is sufficient to say that the Commerce Department has the authority and ability to detect patterns of regularity and investigate beneficial deviations from those patterns—and it must do so regardless of the form of the economy.

These administrative determinations display the attitude that historically has presumed a lack of differentiation in all undeveloped or unexplored areas of human knowledge. The countervailing duty law does not allow countries with nonmarket economies to remain *terra incognita*, blank areas which have no discernable details.

It must be said that all ongoing systems, be they molecular, biological, galactic, or economic, eventually reveal an organized pattern of activity or structure to the human mind. Pattern or structure is inherent in the continuation in existence of a stable or comprehensible unit. That is why, no matter what the environment, a reasonable understanding of its rules of normal operation will lead to recognition of the exceptional or "unfair" event.

All that will be needed in these cases is the ability to distinguish between the normal operation of central control and the exceptional or disproportionate or unfair event. It would be wrong for the Court to be more specific at this time about the method of detecting subsidies within a nonmarket economy. It is sufficient to state that it is not a meaningless effort. Its potential difficulties certainly do not justify the exception to the law sought to be made in this case.

Not all the dons of economic academia can persuade this Court that the government of a country with a nonmarket economy cannot show what amounts to favoritism towards the manufacture, production,

**6.** Fed.Reg. 19372, 19376.

or export of particular merchandise. The idea violates common sense and conflicts with a rational construction of the law.

It is important to remember that the antidumping law presented an apparent difficulty in dealing with nonmarket economies because its plain language lacked a fundamental reference point needed to measure whether or not sales were being made at less than fair market value. The nonmarket economy did not have the fair home market value against which to measure the price to the United States. This did not deter the enforcing agency from developing that "fair" home market value by reference to surrogate countries with market economies, an administrative practice that was later expressly confirmed by incorporation into the Trade Act of 1974. See S.Rep. 93–1298, 93rd Cong.2d Sess. 174 (1974).

It is ironical to see that particular legislation cited by the government as evidence that Congress wanted the antidumping law, and *not* the countervailing duty law, to be the instrument for dealing with merchandise from nonmarket economies. The language of the antidumping law posed a far greater problem of application to nonmarket economies than the countervailing duty law. The language of the countervailing duty law, on the other hand, presented no such problem of application and the simplest implication of leaving it alone is that it needed no clarification to allow it to apply to all forms of economies.

It is even more ironical to see that the term "fair market value" whose "absence," in a literal sense, was overcome rather easily when it came to enforcing the antidumping law with respect to nonmarket economies, now turns up as the key term defining a nonmarket economy and obstructing the application of the countervailing duty law. The agency says that a subsidy needs a "market" and a market

does not exist where there is no fair market value. But if the "absence" of a fair market value did not impede the enforcement of the antidumping law, in which it was a literal requirement, why is its absence an impediment to the enforcement of a law in which it is not even a named factor, but merely one of the possible guides to the detection or measurement of subsidies? In short, if a "perfect" fair market value is not needed to find dumping it is certainly not needed to find or measure subsidies.

The government has also argued that the passage of section 406 of the Trade Act of 1974 (19 U.S.C. § 2436) to protect U.S. industries from injurious market disruption due to sudden increases in imports from Communist countries represented a repudiation of the use of the countervailing duty law. This contention simply has no support in the language of the law or the legislative history. Section 406 is a separate remedy for separate circumstances. The potent specialized nature of the countervailing duty law is not affected by the existence of possible alternative remedies.

The history of the administration of the countervailing duty law does not show the development of any exceptions based on the degree of centralized control exercised by the government of the country of production. In fact, the law has been enforced in the past in circumstances in which central governments exercised a high degress of central control. Although the proceedings may not have involved nonmarket economies as the term is being currently used, the government of Csarist Russia exercised complete control over the sugar industry and the government of Nazi Germany controlled that economy to a very large extent. This did not prevent the imposition of countervailing duties on sugar from Russia[7] or on numerous products from Germany during the 1930's.[8]

---

7. See, *Downs v. United States,* 187 U.S. 496, 23 S.Ct. 222, 47 L.Ed. 275 (1903).

8. *See,* e.g., Countervailing duties—Imports from Germany, T.D. 49878, 74 Tres.Dec. 475 (1939); Countervailing duties on imports from Germa-

ny, T.D. 49821, 74 Treas.Dec. 389 (1939), T.D. 49849, 74 Treas.Dec. 438 (1939), T.D. 49958, 75 Treas.Dec. 82 (1939), T.D. 49998, 75 Treas.Dec. 139 (1939); Countervailing duties on etheyline dibromide from Germany, T.D. 49719, 74 Treas.

From this historical background we can conclude, at the very least, that variation in the extent of control exercised by the foreign government over the economy was not a factor impeding the enforcement of the law. These latest determinations are new developments by the administrative agency. In short, they have no weight of historical administrative practice behind them. If anything, the spirit of past administration goes the other way, as well it should, in the face of the all-inclusive power of the language of the law.

The plain meaning of the law is also not diminished by the government's attempt to patch together a contrary legislative expression from bits and pieces of other laws and later proposed legislation. The true meaning of the amendment to the antidumping duty law and the passage of section 406 of the Trade Act of 1974 has already been discussed.

The parties have also engaged in argument using recent statements by legislators, made in connection with the Trade and Tariff Act of 1984, or proposed trade legislation.

The short answer to the assertion that these shed light, one way or the other, on the question of the application of the countervailing duty law, is that Congress has explicitly stated only one certain opinion on this subject in the Conference Report on the Trade and Tariff Act of 1984—namely: that the issue is under judicial review.[9] This is the plainest possible indication that Congress is waiting to hear the opinion of the Court.

It should also be said that despite the intensity of Congressional interest, it is not correct to interpret a law by means of what legislators say about it in later years. *Southeastern Community College v. Da-*

*vis,* 442 U.S. 397, 411, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979).

In this case, the strength and clarity of the language of the law do not really require examination of legislative history. Moreover, the variety and ambiguity of much of the later legislative material would make it particularly unreliable to use.

The government has made an argument, difficult to follow, that Congressional approval of the Subsidies Code [10] in the Trade Agreements Act of 1979, somehow indicated a choice of antidumping law rather than countervailing duty law for use with products from nonmarket economies. This argument evidently takes the continuation of special provision for nonmarket economies in the antidumping law (previously shown here to be nothing more than a ratification of past administrative practice) as a sign that Congress had rejected the countervailing duty law for use with nonmarket economies. Into this argument the government injects the novel idea that had Congress not rejected the countervailing duty law it would have given petitioners a way to avoid the injury test of the antidumping law—as if the governments of countries' with nonmarket economies had a vested interest in getting the procedure of an injury determination before their products could be assessed with special duties.

This argument is hardly worthy of repetition except as a contrast to the simple and far more persuasive view of the implications of the Trade Agreements Act of 1979. The Act approved the Subsidies Code. Article 15 of the Code clearly gives a country the choice of using subsidy law *or* antidumping law for imports from a country with a state-controlled economy. Moreover, Congress was informed that countries with nonmarket economies had participated

Dec. 192 (1938); Countervailing Duties on certain German products, T.D. 48360, 69 Treas.Dec. 1008 (1936), T.D. 48463, 70 Treas.Dec. 172 (1936), T.D. 48444, 70 Treas.Dec. 134 (1936), T.D. 48479, 70 Treas.Dec. 201 (1936); Countervailing duties—Aluminum foil and manufacturers thereof, T.D. 47312, 66 Treas.Dec. 362 (1034); T.D. 47501, 67 Treas. Dec. 187 (1935).

9. H.Rep. No. 1156, 98th Cong., 2d Sess. 191–92 (1984), U.S.Code Cong. & Admin.News 1984, p. 4910.

10. Agreement on Interpretation and Application of Articles VI, XVI and XXIII of the General Agreement on Tariffs and Trade.

in the preparation of the Code [11] and that it had been signed, subject to subsequent ratification, by two such countries.[12]

In the opinion of the Court this constitutes overwhelming evidence that the 1979 Act shows a definite understanding by Congress that the countervailing duty law covers countries with nonmarket economies.

All these considerations lead the Court to conclude that the Commerce Department's determinations were contrary to law. To allow it to develop such an extraordinary exception to the law would go beyond deference to an administrative agency. It would be an abdication of judicial responsibility.

For the reasons explained in this opinion the determinations under review are found to be arbitrary and not in accordance with the law.

The final determinations with respect to carbon steel wire rod from Czechoslovakia and Poland are reversed and the matters are remanded for determinations consistent with this opinion.

The recission of the investigations into potassium chloride from the Soviet Union and the German Democratic Republic is set aside and the investigations shall resume in a manner consistent with this opinion.

The parties shall have thirty days from the date of entry of this opinion to agree on a schedule for these remanded matters and to report that schedule to the Court. If they cannot agree they shall report their request for scheduling and the Court will set a schedule.

**11.** Message from the President of the United States transmitting the Texts of the Trade Agreements Negotiated in the Tokyo Round of the Multilateral Trade Negotiations, Pursuant to Section 102 of the Trade Act of 1974, H.R.Doc. No. 153, 96th Cong., 1st Sess. 259 (1979).

**12.** Report of the International Trade Commission to the Subcommittee on International Trade, Senate Finance Committee, Analysis of Nontariff Agreements, U.S.I.T.C. Inv. No. 332–101, 96th Cong., 1st Sess. i–iv (1979).