**GEORGETOWN STEEL
CORPORATION, et al.,
Appellees,**

**v.**

**The UNITED STATES, Appellant.**

**Appeal No. 85–2805.**

United States Court of Appeals,
Federal Circuit.

Sept. 18, 1986.

David M. Cohen, Director, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., for appellant. With him on the brief were Richard K. Willard, Asst. Atty. Gen. and Velta A. Melnbrencis. Daniel Hunter, Dept. of Commerce, Intern. Trade Admin., Washington, D.C., of counsel.

Richard O. Cunningham, Steptoe & Johnson, Washington, D.C., for OCAP. With him on the brief were Susan G. Esserman, Jeanne E. Davidson and Jo Anne Swindler.

Charles Owen Verrill, Jr., Wiley & Rein, Washington, D.C., for appellee Georgetown Steel Corp. With him on the brief were James M. Johnstone, Robert E. Nielsen and William B. Baker.

David E. Birenbaum and Alan Kashdan, Fried, Frank, Shriver, Harris & Jacobson, Washington, D.C., were on the brief for appellee Atlantic Steel Co.

W.H. Harrell Smith, Drinker, Biddle & Reath, Washington, D.C., for amicus curiae, U.S. Steelworkers. With him on the brief was James S. Gkonos, of counsel.

N. David Palmeter and Jeffrey S. Neeley, Mudge Rose Guthrie Alexander & Ferdon, Washington, D.C., were on the brief for appellees Kali-Bergbau and Philipp Bros., Inc. Kevin B. Dwyer, Mudge Rose Guthrie Alexander & Ferdon, Washington, D.C., entered an appearance for appellee Kali-Bergbau and Philipp Bros., Inc.

C. Loring Jetton, Jr., John D. Greenwald and Thomas F. Connell, Wilmer, Cutler & Pickering, Washington, D.C., were on the brief for amicus curiae, American Textile Mfrs. Institute.

Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., Mary Elizabeth Tuck and D. Scott Nance, Stewart & Stewart, Washington, D.C., were on the brief for amicus curiae, PPG Industries, Inc. and The Timken Co.

Before MARKEY, Chief Judge, and FRIEDMAN and NIES, Circuit Judges.

FRIEDMAN, Circuit Judge.

The substantive issue in this case, here on appeal from the Court of International Trade, is whether the countervailing duty provisions in section 303 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1303 (1982), apply to alleged subsidies granted by countries with so-called nonmarket economies for goods exported to the United States. The International Trade Administration of the Department of Commerce (Administration) held that section 303 does not apply to nonmarket economies. The Court of International Trade reversed, holding that the Administration's determination was contrary to law.

We reverse the ruling of the Court of International Trade and uphold the Administration's determination. We also hold that the Court of International Trade had no jurisdiction over one of the two cases it decided, because the appeal in that case

was not timely filed. We therefore reverse part of the order of the Court of International Trade, and vacate the other part of the order and remand with instructions to dismiss part of the case.

## I

A. In November 1983, the appellees, Georgetown Steel Corporation, Raritan River Steel Company, and Atlantic Steel Company (collectively, Georgetown Steel), and Continental Steel Corporation (Continental Steel), filed two countervailing duty petitions with the Administration on behalf of domestic producers of carbon steel wire rod. They alleged that carbon steel wire rod (wire rod) imported into the United States from Czechoslovakia and Poland, respectively, was "subsidized" and therefore subject to countervailing duties under section 303. According to them, the subsidies provided for the exported wire rod involved (1) the receipt of exchange rates higher than the official rates, (2) direct payments on goods sold abroad at prices below domestic prices, (3) retention by the exporting entity of part of the "hard currency" obtained from the export sales, (4) application of "trade conversion coefficients" to change the exchange rate and thereby create a more favorable return on the exports, and (5) granting of income tax rebates for such sales.

The Administration instituted countervailing duty investigations based upon those complaints. After hearing, the Administration issued final negative determinations. It held that the Czechoslovakian and Polish exports of wire rod had not received any "bounty" or "grant" within the meaning of section 303, so that countervailing duties on those items were not applicable.

The Administration concluded that, as a matter of law, section 303 was inapplicable to nonmarket economies. 49 Fed.Reg. 19370, 19374 (1984). The Administration defined a "subsidy" as "any action that distorts or subverts the market process and results in a misallocation of resources, encouraging inefficient production and lessen-

ing world wealth." *Id.* at 19371, 19375. The agency reasoned that the concept of subsidies, and the misallocation of resources that resulted from subsidization, had no meaning in an economy that had no markets and in which activity was controlled according to central plans. *Id.*

B. While the wire rod cases were pending, Amax-Chemical, Incorporated, and Kerr-McGee Chemical Corporation filed with the Administration petitions alleging that the Soviet Union and the German Democratic Republic had provided subsidies for potash imported into the United States from those countries. The Administration commenced investigations into those complaints. After deciding the wire rod cases, the Administration rescinded its investigations in the potash cases and dismissed those complaints on the ground that both of those countries had nonmarket economies, and that under its decision in the Polish wire rod case, section 303 was inapplicable to nonmarket economies. *Id.* at 23428, 23429.

C. Georgetown Steel and Continental Steel sought review in the Court of International Trade of the Administration's negative countervailing duty determinations in the wire rod cases, and Amax Chemical and Kerr-McGee sought review there of the dismissal of their petitions in the potash cases. The court consolidated the cases.

The Court of International Trade reversed the Administration and held that the countervailing duty law covers nonmarket economies. The court stated that the premise of the Administration "that a subsidy can only exist in a market economy" was "fundamental error." *Continental Steel Corp. v. United States*, 614 F.Supp. 548, 550 (1985). It said that "[t]he only purpose of the countervailing duty law [was] to extract the subsidies contained in merchandise entering the commerce of the United States in order to protect domestic industry from their effect ... [and that] its effectiveness [was] clearly intended to be complete and without exception." *Id.* at 553. The court remanded the cases to the

Administration for further proceedings consistent with its opinion.

## II

The United States contends here, as it did in the Court of International Trade, that that court did not have jurisdiction over the wire rod cases because Georgetown Steel did not file a timely appeal to that court. (Continental Steel does not appear as a party in this court.)

A. The timeliness question arises out of the following facts. Georgetown Steel followed the bifurcated procedure for appealing to the Court of International Trade permitted in section 516A of the Tariff Act of 1930, as amended by the Trade Agreements Act of 1979, 19 U.S.C. § 1516a(a)(2)(A), of first filing a summons and then filing a complaint. Georgetown Steel timely filed the summons by mailing it to the clerk of the court on May 24, 1984, which was within 30 days of the publication in the Federal Register of the negative countervailing duty determination.

Georgetown Steel mailed the complaint to the clerk of the court by certified mail on June 22, 1984, which was within 30 days of the filing of the summons. The Postal Service, however, returned the complaint on July 6, 1984, because of insufficient postage. That same day, Georgetown Steel remailed the complaint, accompanied by a motion for leave to file the complaint out of time. The government opposed that motion, but the Court of International Trade granted it.

B. Section 516A, 19 U.S.C. § 1516a(a)(2)(A), provides that "an interested party ... may commence an action" in the Court of International Trade contesting a negative countervailing duty determination

[w]ithin thirty days after the date of publication in the Federal Register ... by filing a summons, and within thirty days thereafter a complaint.

This provision is plain and unambiguous. It imposes two requirements for "commenc[ing] an action" in the Court of International Trade challenging a negative coun-

tervailing duty determination: (1) within 30 days of the publication of the determination in the Federal Register, a summons must be filed, and (2) "within thirty days thereafter a complaint" must be filed. The statute requires both steps and imposes precise time limits within which each step must be taken.

Rule 5(g) of the Rules of the Court of International Trade provides that filing of a pleading by mail "is completed when received, except that a pleading ... mailed by registered or certified mail ... to the clerk of the court, with the proper postage affixed and return receipt requested, shall be deemed ... filed as of the date of mailing." The Court of International Trade has held that a summons in a case challenging an antidumping determination was not timely filed when mailed to the clerk within 30 days of the determination but returned to the sender for insufficient postage and ultimately filed with the clerk more than 30 days after the determination. The court stated that "the date-of-mailing exception in Rule 5(g) expressly requires certified mail 'with the proper postage affixed.' By failing to affix sufficient postage to the summons, plaintiff failed to fulfill an explicit condition under Rule 5(g) for date-of-mailing filing." *NEC Corp. v. United States*, 622 F.Supp. 1086 (CIT 1985), *reh'g denied*, 628 F.Supp. 976 (1986).

In *Jernberg Forgings Co. v. United States*, 7 CIT 62 (1984), *vacated on other grounds*, 8 CIT 245 (1984), the Court of International Trade held that where the summons had been timely filed but the complaint had been mailed with insufficient postage and therefore not filed within 30 days of the summons, the complaint was untimely filed. The court, however, authorized the untimely filing on the ground that only the 30–day filing requirement for the summons was jurisdictional. As explained below, we disagree with the latter ruling. We conclude that the principle the Court of International Trade applied in *NEC* is equally applicable in the present case.

■ That principle requires the conclusion that Georgetown Steel's complaint was not filed until July 6, 1984, which was the first time Georgetown Steel mailed the complaint, "with the proper postage affixed." This was 43 days after the summons was filed. The filing of the complaint therefore did not satisfy the requirement in section 1516a(a)(2)(A) that to "commence an action" in the Court of International Trade challenging a negative countervailing duty determination, the complaint must be filed "within thirty days [after]" "filing a summons."

■ Since section 1516a(a)(2)(A) specifies the terms and conditions upon which the United States has waived its sovereign immunity in consenting to be sued in the Court of International Trade, those limitations must be strictly observed and are not subject to implied exceptions. *Lehman v. Nakshian*, 453 U.S. 156, 161, 101 S.Ct. 2698, 2701, 69 L.Ed.2d 548 (1981). If a litigant fails to comply with the terms upon which the United States has consented to be sued, the court has no "jurisdiction to entertain the suit." *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607, (quoting *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941)).

■ C. Georgetown Steel contends, however, that the only jurisdictional prerequisite for invoking the jurisdiction of the Court of International Trade is the filing of a summons within 30 days after the negative countervailing duty determination (which Georgetown Steel did), and that the Court of International Trade therefore was authorized under its Rule 6(b) to waive the 30–day limit for filing a complaint. Georgetown Steel relies upon 28 U.S.C. § 2636(c) (1982), which stated (when Georgetown Steel filed its summons) that a civil action under section 516A "is barred unless commenced in accordance with the rules of the Court of International Trade within thirty days after the date of the publication of such final determination in the Federal Register."

Section 2636(c), however, did not modify the requirement in section 1516a(a)(2)(A) that commencement of an action in the Court of International Trade requires both the filing of a summons within 30 days of the publication of the determination in the Federal Register and the filing of a complaint within 30 days thereafter. Section 2636(c) merely stated that unless the action is commenced within 30 days of the publication of the determination, in accordance with the rules of the Court of International Trade, it is barred. It did not purport to change the unequivocal requirement in section 1516a(a)(2)(A) for the filing by specified dates of both a summons and a complaint. The legislative history of the Customs Courts Act of 1980, Pub.L. No. 96–417, 94 Stat. 1727, which enacted section 2636(c), stated that that section "substantially restates the law set forth in section 516A of the Tariff Act of 1930, as added by the Trade Agreements Act of 1979." H.R. Rep. No. 1235, 96th Cong., 2d Sess. 56 (1980), *reprinted in* 1980 Code Cong. & Ad.News 3729, 3767. *See* S.Rep. No. 466, 96th Cong., 1st Sess. 17 (1979); *Bethlehem Steel Corp. v. United States*, 742 F.2d 1405, 1411–12 (Fed.Cir.1984).

Georgetown Steel's argument is refuted not only by the language of section 1516a(a)(2)(A), but also by the legislative history of that provision, which was part of the Trade Agreements Act of 1979, Pub.L. No. 96–39, title X, § 1001(a), 93 Stat. 144, 300 (amended 1980, 1982). The Senate Report on the legislation stated that the complaint must be "filed within 60 days of the filing of the determination complained of." S.Rep. No. 249, 96th Cong., 1st Sess. 251 (1979), *reprinted in* 1979 U.S.Code Cong. & Ad.News 381, 636. Congress thus recognized that the timely filing of the complaint was an essential element to invoke the jurisdiction of the court.

Georgetown Steel apparently also relies upon 28 U.S.C. § 2632(c), which provides that "[a] civil action in the Court of International Trade under section 516A of the Tariff Act of 1930 shall be commenced by filing with the clerk of the court a summons or a summons and a complaint, as

prescribed in such section, with the content and in the form, manner, and style prescribed by the rules of the court." This provision similarly does not modify the explicit requirements of section 1516a(a)(2)(A) regarding the filing of a complaint. It merely gives the plaintiff the alternative of separately filing a summons and then a complaint, or of filing the two together. (The plaintiffs in the potash case followed the second procedure; they filed the summons and the complaint on the same day.) Although section 2632(c) permits the initiation of an action by filing a summons, it does not eliminate the additional requirement in section 1516a(a)(2)(A) that within 30 days after filing the summons the complaint must be filed.

Georgetown Steel cites *Jernberg, supra,* for the proposition that the only mandatory jurisdictional time requirement for commencing an action in the Court of International Trade is the timely filing of the summons, and that the Court of International Trade may extend the time for filing a complaint pursuant to its Rule 6(b), which provides: "[w]hen by these rules or by a notice given thereunder or by order of the court, an act is required or allowed to be done at or within a specified time, the court may upon motion, for good cause shown, order the period extended." For the reasons already given, we disagree with the Court of International Trade's ruling in *Jernberg* and decline to follow it. The Court of International Trade cannot by rule modify a requirement Congress has imposed. That is precisely what that court's rule 3(a) attempted to do, by providing that an action under 19 U.S.C. 1516a(a)(2) is "commenced by filing a summons only."

D. Finally, Georgetown Steel argues that even if both a summons and a complaint must be filed to give the Court of International Trade jurisdiction, its complaint was timely because it was filed within 60 days after the publication in the Federal Register of the Administration's determination. Although the statute sets a 60–day outside limit for filing a complaint, it does not validate every complaint that is filed within that period. Instead, as we

have shown, it requires that the complaint be filed within 30 days after the summons is filed. Since Georgetown Steel did not file its complaint within 30 days after filing the summons, it is immaterial whether it filed its complaint within 60 days of the publication of the Administration's determination.

E. The result is that we vacate the order of the Court of International Trade insofar as it set aside the Administration's negative countervailing duty determination in the wire rod cases, and remand those cases to that court to dismiss Georgetown Steel's complaint for lack of jurisdiction.

There is no question, however, that the summons and complaint in the potash cases were timely filed. We therefore review the merits of the Court of International Trade's reversal of the Administration's determination in those cases.

### III

Section 303 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1303 (1982), which authorizes the levy of countervailing duties, provides as follows:

> [W]henever any country ... or other political subdivision of government ... shall pay or bestow, directly or indirectly, any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country ... or other political subdivision of government, then upon the importation of such article or merchandise into the United States, whether ... imported directly ... or otherwise, ... there shall be levied and paid, in all such cases, in addition to any duties otherwise imposed, a duty equal to the net amount of such bounty or grant, however the same be paid or bestowed.

The question before us is whether the economic incentives and benefits that the nonmarket economies of the Soviet Union and the German Democratic Republic have granted in connection with the export of potash from those countries to the United States constitute a "bounty" or a "grant"

as those terms are used in section 303. In its decision in the potash cases, the Administration defined a nonmarket economy as one that "operates on principles of non-market cost or pricing structures so that sales or offers for sale of merchandise in that country or to other countries do not reflect the market value of the merchandise." 49 Fed.Reg. 23428, 23429 (1984). As the Administration explained in the wire rod cases, in a nonmarket economy "resources are not allocated by a market. With varying degrees of control, allocation is achieved by central planning." *Id.* at 19371, 19375.

The Administration found in the potash cases that both the Soviet Union and the German Democratic Republic are nonmarket economies. *Id.* at 23428, 23429. Those findings are not here challenged, and we base our decision upon them.

Congress has not defined the terms "bounty" and "grant" as used in section 303. We cannot answer the question whether that section applies to nonmarket economies by reference to the language of the statute. Nor can we answer it, as the Court of International Trade did, by characterizing the statutory language as "abundantly clear" and "the broadest possible," the "plain meaning" of which reflects "an intent to cover as many beneficial acts [for the exporter] as possible," and then concluding that Congress has not attempted to exclude nonmarket economies from what the court believed to be the sweeping reach of the section. 614 F.Supp. at 550–52, 555–57.

In its relevant terms, section 303 is substantially unchanged from the first general countervailing duty statute Congress enacted as section 5 of the Tariff Act of July 24, 1897, 30 Stat. 205. *See Zenith Radio Corp. v. United States,* 437 U.S. 443, 448, 98 S.Ct. 2441, 2444, 57 L.Ed.2d 337 (1978). At the time of the original enactment there were no nonmarket economies; Congress therefore had no occasion to address the issue before us.

Since that time Congress has reenacted section 303 six times, without making any changes of significance to the issue before us. *Zenith, id.* n. 8; *see* Trade Agreements Act of 1979, Pub.L. No. 96–39, §§ 103, 105(a), 93 Stat. 190, 193, which, after *Zenith,* reenacted the section a sixth time. That fact itself strongly suggests that Congress did not intend to change the scope or meaning of the provision it had first enacted in the last century. *See* S.Rep. No. 249, 96th Cong., 1st Sess. 43 (1979), *reprinted in* 1979 U.S.Code Cong. & Ad.News 381, 429. This conclusion is supported by the fact, discussed in part IIIB below, that Congress on several occasions in other statutes specifically dealt with exports from nonmarket economies.

Since, as the Administration stated in the Polish wire rod case, "Congress never has confronted directly the question of whether the countervailing duty law applies to [non-market-economy] countries ..., the function of an administrative agency, as well as a court, is 'to discern dispositive legislative intent by "projecting as well as it could how the legislature would have dealt with the concrete situation if it had spoken." ' *Asahi Chemical Industry Co. Ltd. v. United States,* 548 F.Supp. 1261, 4 CIT 120, 124 (1982) (quoting from *District of Columbia v. Orleans,* 406 F.2d 957, 958 (D.C.Cir.1968))." 49 Fed.Reg. 19377 (1984). In other words, we must determine, as best we can, whether when Congress enacted the countervailing duty law in 1897 it would have applied the statute to nonmarket economies, if they then had existed.

Based upon the purpose of the countervailing duty law, the nature of nonmarket economies and the actions Congress has taken in other statutes that specifically address the question of exports from those economies, we conclude that the economic incentives and benefits that the Soviet Union and the German Democratic Republic have provided for the export of potash from those countries to the United States do not constitute bounties or grants under section 303 of the Tariff Act of 1930, as amended.

A. In *Zenith,* the Supreme Court stated the purpose of the 1897 Act as follows:

> The countervailing duty was intended to offset the unfair competitive advantage that foreign producers would otherwise enjoy from export subsidies paid by their governments.

437 U.S. at 455–56, 98 S.Ct. at 2448.

Congress thus sought to protect American firms from what it viewed as the unfair competitive advantage a foreign producer would have in selling in the American market if that producer's government in effect assumed part of the producer's expenses of selling here. As the Administration stated in the Polish wire rod case, "[i]n a market economy, scarce resources are channeled to their most profitable and efficient uses by the market forces of supply and demand.... In the absence of government intervention, market economies are characterized by flexible prices determined through the interaction of supply and demand. In response to these prices, resources flow to the most profitable and efficient uses." 49 Fed.Reg. 19375 (1984).

American firms were expected and generally were able to compete effectively in the American market against foreign sellers who were subject to the same market pressures and constraints as they were. A foreign seller normally would do business in the American market only because it was profitable for it to do so, and because such sales presumably were at least as profitable, if not more so, than sales elsewhere.

A government subsidy on sales to the United States, however, enabled a foreign producer to sell in the American market in a situation in which otherwise it would not be in the seller's best economic interest to do so. This apparently was what the Administration had in mind when it stated in the Polish wire rod case that "a subsidy (or bounty or grant) is definitionally any action that distorts or subverts the market process and results in a misallocation of resources, encouraging inefficient production and lessening world wealth." *Id.* It was

this kind of "unfair" competition, resulting from subsidies to foreign producers that gave them a competitive advantage they otherwise would not have, against which Congress sought to protect in the countervailing duty law.

In exports from a nonmarket economy, however, this kind of "unfair" competition cannot exist. Although a nonmarket state may engage in foreign trade through various entities, the state controls those entities and determines where, when and what they will sell, and at what prices and upon what terms. As the Administration explained in the Polish wire rod case,

> the nonmarket environment is riddled with distortions. Prices are set by central planners. "Losses" suffered by production and foreign trade enterprises are routinely covered by government transfers. Investment decisions are controlled by the state. Money and credit are allocated by the central planners. The wage bill is set by the government. Access to foreign currency is restricted. Private ownership is limited to consumer goods.

*Id.* at 19376. *See also* G.M. Pickersgill & J.E. Pickersgill, *Contemporary Economic Systems: A Comparative View* 208, 232–33 (1974); P. Marer, *Prices and Exchange Rates in Centrally Planned Economies, Focusing on the USSR and GDR* (Indiana University, Feb. 9, 1984).

In the potash cases the alleged subsidies provided by the Soviet Union and the German Democratic Republic were the receipt on export sales of foreign exchange rates higher than the official rates, direct price equalization payments on exports and, in the case of the Soviet Union, retention by the exporting entities of a portion of the hard currency they earned on foreign sales. Although these benefits may encourage those entities to accomplish the economic goals and objectives the central planners set for them, *see* R.G. Lipsey & P.O. Steiner, *Economics* 803–04 (2d ed. 1969), they do not create the kind of unfair competitive advantage over American firms against

which the countervailing duty act was directed.

There is no reason to believe that if the Soviet Union or the German Democratic Republic had sold the potash directly rather than through a government instrumentality, the product would have been sold in the United States at higher prices or on different terms. Unlike the situation in a competitive market economy, the economic incentives the state provided to the exporting entities did not enable those entities to make sales in the United States that they otherwise might not have made. Even if one were to label these incentives as a "subsidy," in the loosest sense of the term, the governments of those nonmarket economies would in effect be subsidizing themselves. Those governments are not providing the exporters of potash to the United States with the kind of "bounty" or "grant" for which Congress in section 303 prescribed the imposition of countervailing duties.

B. Further support for our conclusion is furnished by the more recent actions of Congress in dealing with the problem of exports by nonmarket economies through other statutory provisions. Those statutes indicate that Congress intended that any selling by nonmarket economies at unreasonably low prices should be dealt with under the antidumping law. There is no indication in any of those statutes, or their legislative history, that Congress intended or understood that the countervailing duty law also would apply.

1. In the Trade Act of 1974 (1974 Act), Pub.L. No. 93–618, 88 Stat. 1978 (1975), Congress amended the antidumping law, 19 U.S.C. §§ 160–171 (1976) (repealed 1979) (current version at 19 U.S.C. §§ 1673–1673i (1982)) (which was first enacted in 1921, Antidumping Act, 1921, ch. 14, §§ 201–212, 42 Stat. 11–15), to deal specifically with exports from nonmarket economies. Under the antidumping law, when "foreign merchandise [that] is being, or is likely to be, sold in the United States at less than its fair value" threatens to cause or causes actual material injury to a domestic indus-

try or to the establishment of a domestic industry, duties are imposed on that merchandise. 19 U.S.C. § 1673 (1982). The existence and extent of "dumping" are determined on the basis of the excess of the foreign market value of the goods in the country of production over the selling price for the merchandise in the United States. *Id.*

In the 1974 Act, Congress enacted a special "surrogate country" method for determining whether imports from nonmarket economies were being "dumped" in the United States. 19 U.S.C. § 164(c) (1976) (repealed 1979). Reasoning that in "State-controlled-economy countries ... the supply and demand forces do not operate to produce prices, either in the home market or in third countries, which can be relied upon for comparison," S.Rep. No. 1298, 93d Cong.2d Sess. 174 (1974), *reprinted in* 1974 U.S.Code Cong. & Ad.News 7186, 7311, Congress provided that the foreign market value of goods from nonmarket economies should be determined on the basis of either a constructed value or the actual selling price of some other market economy country that sells the same or similar merchandise either for home consumption or to other countries. 19 U.S.C. § 164(c) (1976).

In section 331 of the 1974 Act, Congress also amended the countervailing duty law. Trade Act of 1974, § 331(a), 88 Stat. 2049. There is no indication, however, that in doing so Congress intended to change the scope of that law or believed that it covered nonmarket economies. If Congress had so intended or believed, it is curious that the legislature gave no such indication, particularly in view of the specific changes it made in the antidumping law to deal with the problem.

2. In the Trade Agreements Act of 1979 (1979 Act), Congress reenacted the special surrogate country antidumping provisions applicable to State-controlled economies that it had previously authorized in the 1974 Act. Pub.L. No. 96–39, title I, § 101, 93 Stat. 182. The present provision states that if the economy of the exporting country is "State-controlled to an extent that

sales or offers of sales of such or similar merchandise in that country or to countries other than the United States do not permit a determination of foreign market value under subsection (a) of this section," the foreign market value of the merchandise shall be determined

on the basis of the normal costs, expenses, and profits as reflected by either—

(1) the prices, determined in accordance with subsection (a) of this section, at which such or similar merchandise of a non-State-controlled economy country or countries is sold either—

(A) for consumption in the home market of that country or countries, or

(B) to other countries, including the United States; or

(2) the constructed value of such or similar merchandise in a non-State-controlled-economy country or countries as determined under subsection (e) of this section.

19 U.S.C. § 1677b(c) (1982).

In the same statute Congress approved the Subsidies Code, which a number of countries had adopted to implement the General Agreement on Tariffs and Trade, April 12, 1979, 31 U.S.T. 513, T.I.A.S. No. 9619. 19 U.S.C. § 2503 (1982). Article 15 of the Subsidies Code permitted signatory countries to regulate imports from State-controlled economies based on a surrogate cost methodology under either antidumping or countervailing duty legislation enacted in the particular signatory country. Whichever legislation the signatory country chose to use, it was required to calculate the margin of dumping or the amount of the estimated subsidy by comparison of the export price with:

(a) the price at which a like product of a country other than the importing signatory [or exporting country] ... is sold, or

(b) the constructed value of a like product in a country other than the importing signatory [or exporting nonmarket economy country].

If neither prices nor constructed value as established under (a) or (b) above provide an adequate basis for determination of dumping or subsidies then the price in the importing signatory, if necessary, duly adjusted to reflect reasonable profits, may be used.

As was the case with the 1974 Act, in the 1979 Act Congress also made various changes in the countervailing duty law. Pub.L. No. 96–39, §§ 103, 105(a), 93 Stat. 190, 193. Once again, however, it gave no indication that it understood or intended the latter law to apply to nonmarket economies. Indeed, Congress' realization, reflected in both the 1974 and 1979 Acts, that changes in the antidumping law were necessary to make that law more effective in dealing with exports from nonmarket economies, coupled with its silence about application of the countervailing duty law to such exports, strongly indicates that Congress did not believe that the latter law covered nonmarket economies.

The Court of International Trade noted that Article 15 of the Subsidies Code gave "a country the choice of using subsidy law [countervailing duty law] or antidumping law for imports from a country with a state-controlled economy," and that "Congress was informed that countries with nonmarket economies had participated in the preparation of the Code and that it had been signed, subject to subsequent ratification, by such countries." 614 F.Supp. at 556–57 (footnotes omitted). The court viewed this as "overwhelming evidence that the 1979 Act show[ed] a definite understanding by Congress that the countervailing duty law covers countries with nonmarket economies." Id. at 557.

The latter conclusion, however, is a non-sequitur. It also is inconsistent with our analysis of the Congressional understanding and purpose in enacting the provisions in the 1974 and 1979 Acts dealing with the application of the antidumping law to nonmarket economies.

Since the Subsidies Code was the product of joint agreement among a number of countries, which had varying laws dealing with selling at unreasonably low prices by foreign producers, it was only natural that

the Code would merely prescribe the method for determining the existence of a subsidy, and leave it to each country to determine the particular method it would use to deal with the problem. In the United States, as we have held, Congress elected to deal with the problem under the antidumping law and not under the countervailing duty law. The fact that Congress adopted the Code, under which the United States also could have proceeded under the countervailing duty law, does not establish that in fact it did so.

C. The *amici curiae* argue that the Administration's construction of section 303 in effect stands the statute on its head, because it excepts countries that are the worst distorters of world markets from the countervailing duties that are designed to offset and balance those market distortions.

Congress, however, has decided that the proper method for protecting the American market against selling by nonmarket economies at unreasonably low prices is through the antidumping law. This law is designed to protect domestic industry from injury resulting from the sale in the United States of foreign merchandise that is priced below its fair value, and provides a remedy therefor in 19 U.S.C. § 1677b(c). If that remedy is inadequate to protect American industry from such foreign competition—a question we could not possibly answer—it is up to Congress to provide any additional remedies it deems appropriate.

D. In *United States v. Zenith Radio Corp.*, 562 F.2d 1209, 1219 (CCPA 1977), *aff'd*, 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978), the Court of Customs and Patent Appeals, whose decisions we follow, recognized that the agency administering the countervailing duty law has broad discretion in determining the existence of a "bounty" or "grant" under that law. We cannot say that the Administration's conclusion that the benefits the Soviet Union and the German Democratic Republic provided for the export of potash to the United States were not bounties or grants under section 303 was unreason-

able, not in accordance with law or an abuse of discretion. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). *See also Melamine Chemicals, Inc. v. United States*, 732 F.2d 924, 928 (Fed.Cir.1984).

### CONCLUSION

The order of the Court of International Trade is vacated insofar as it reversed the Administration's final countervailing duty determinations in the Czechoslovakian and Polish wire rod cases, and the case is remanded to that court with instructions to dismiss the complaint in those cases for lack of jurisdiction because the complaint was not timely filed. The order of the Court of International Trade is reversed insofar as it set aside the Administration's final actions in the Soviet Union and German Democratic Republic potash cases.

VACATED IN PART, REVERSED IN PART, AND REMANDED.