**Slip Op. 02-37**

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| USINAS SIDERÚRGICAS DE MINAS GERAIS S/A, COMPANHIA SIDERÚRGICA PAULISTA and COMPANHIA SIDERÚRGICA NACIONAL, | : | |
| | : | |
| *Plaintiffs*, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| *Defendant,* | : | |
| | : | |
| and | : | Court No. 99-08-00528 |
| | : | |
| BETHLEHEM STEEL CORPORATION, U.S. STEEL GROUP, A UNIT OF USX CORPORATION, ISPAT INLAND INC., LTV STEEL COMPANY, INC. and NATIONAL STEEL CORPORATION, | : | |
| | : | |
| *Defendant-Intervenors,* | : | |
| | : | |
| and | : | |
| | : | |
| GALLATIN STEEL COMPANY, IPSCO STEEL INC., STEEL DYNAMICS, INC. and WEIRTON STEEL CORPORATION, | : | |
| | : | |
| *Defendant-Intervenors*. | : | |

[Exporters' action seeking to challenge continued final affirmative countervailing duty determination without challenging related suspension determination dismissed for want of subject matter jurisdiction.]

Decided:  April 19, 2002

Willkie Farr & Gallagher (William H. Barringer, Christopher S. Stokes, and Sean M. Thornton), for Plaintiffs.

Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Lucius B. Lau); Terrence J. McCartin, Senior Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel; for Defendant.

Dewey Ballantine (Alan Wm. Wolff and Michael H. Stein) and Skadden Arps, Slate, Meagher & Flom (Robert E. Lighthizer, John J. Mangan, and Worth S. Anderson), for Defendant-Intervenors Bethlehem Steel Corporation *et al*.

Schagrin Associates (Roger B. Schagrin, Brian E. McGill, and Roger B. Banks), for Defendant-Intervenors Gallatin Steel Company *et al*.

**OPINION**

RIDGWAY, Judge:

Over the years, legal scholars and jurists have devoted much ink to the meaning in various legal contexts of certain common words – the eternal debate over "shall" vs. "may" being one prime example. *See*, *e.g.*, Bryan A. Garner, A Dictionary of Modern Legal Usage 502 ("shall"), 516-17 ("Statute Drafting") (1987). This is yet another such case.

As discussed more fully below, the disposition of the case at bar turns largely on the meaning of the word "including." The stakes may not be high in the whimsical world of fairy tales, when the terms in question are "brillig" and "slithy":

> "When *I* use a word," Humpty Dumpty said in rather a scornful tone, "it means just what I choose it to mean – neither more nor less."
>
> "The question is," said Alice, "whether you *can* make words mean so many different things."
>
> "The question is," said Humpty Dumpty, "which is to be master – that's all."

Lewis Carroll, Through the Looking Glass and What Alice Found There 124 (William Morrow &

Co. 1993) (1872). But the present case does not arise in Humpty Dumpty land, where words mean

whatever one wants them to mean; and the stakes here are very high indeed.

This action is one of a trilogy of cases involving antidumping duty and countervailing duty

investigations of certain hot-rolled flat-rolled carbon-quality steel products ("hot-rolled steel") from

Brazil.[1] In this case, the plaintiff Brazilian steel exporters – Usinas Siderurgicas de Minas Gerais

("USIMINAS"), Companhia Siderurgica Paulista ("COSIPA"), and Companhia Siderurgica

Nacional ("CSN") (collectively, "Brazilian Exporters") – seek to challenge the continued final

affirmative countervailing duty determination of the U.S. Department of Commerce ("Commerce").

See Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From Brazil, 64 Fed. Reg.

38,742 (Dep't Commerce 1999) ("Continued Final Determination"). Commerce made that

determination the same day that it executed a suspension agreement with the Government of Brazil

("Brazilian Government") – an agreement which is itself contested in one of the two related actions

brought by certain of the U.S. steel producers who are Defendant-Intervenors in this action.[2] See

Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From Brazil, 64 Fed. Reg. 38,797

---

[1]The two companion cases are Court No. 99-08-00524 (challenging an agreement suspending an antidumping investigation of the Brazilian steel producers who are Plaintiffs here), and Court No. 99-08-00525 (challenging Commerce's determination to enter into an agreement suspending the countervailing duty investigation at issue in this proceeding).

The action challenging the suspension agreement in the antidumping duty investigation has now been dismissed. See Bethlehem Steel Corp. v. United States, No. 99-08-00524, 2002 Ct. Int'l Trade LEXIS 36 (CIT Apr. 2, 2002).

[2]Defendant-Intervenors did not participate in the briefing on the jurisdictional issue addressed in this opinion.

(Dep't Commerce 1999) (suspension of countervailing duty investigation and entry of suspension agreement) ("Suspension Determination" or "Suspension Agreement").

The Brazilian Exporters' Complaint in this matter asserts five specific challenges to Commerce's Continued Final Determination. Complaint ¶ 7. However, the Complaint does not seek review of any aspect of Commerce's determination to suspend the countervailing duty investigation or to enter into the Suspension Agreement with the Brazilian Government. Nor does the Complaint allege that any changes made in Commerce's Continued Final Determination rendered the Suspension Determination defective in any way.

Pending before the Court is the Motion To Dismiss for Lack of Subject Matter Jurisdiction filed by Defendant, the United States ("the Government"). According to the Government, the sovereign has waived its immunity from suit to permit a party to challenge a continued final countervailing duty determination that changes the size of the net countervailable subsidy (or the underlying reasoning) at the time a suspension agreement is concluded *only if* that challenge is raised as part of a challenge to Commerce's decision to suspend the countervailing duty investigation in question. Defendant's Memorandum in Support of Its Motion To Dismiss For Lack of Subject Matter Jurisdiction ("Defendant's Memo"), *passim*. In other words, according to the Government, the Court lacks jurisdiction because the Brazilian Exporters' Summons and Complaint do not attack *both* Commerce's Continued Final Determination *and* the Suspension Determination and Agreement.

For the reasons discussed below, the Government's motion is granted and this action is dismissed for want of subject matter jurisdiction.

# I. Background

## A. Administrative Proceedings

On September 30, 1998, certain U.S. steel producers – including Defendant-Intervenors here[3] – petitioned Commerce and the International Trade Commission ("ITC"), seeking the imposition of countervailing duties on hot-rolled steel from Brazil.[4]   The petition was accepted, and the requested investigation was initiated. Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From Brazil, 63 Fed. Reg. 56,624 (Dep't Commerce 1998).

One month later, the ITC notified Commerce of its preliminary affirmative determination on material injury. *See* Certain Hot-Rolled Steel Products From Brazil, Japan, and Russia, 63 Fed. Reg. 65,221 (ITC 1998).   Commerce's own preliminary affirmative determination issued on February 12, 1999, tentatively finding net subsidy rates of 9.45% for USIMINAS and COSIPA, 6.62% for CSN, and 7.85% for all others. *See* Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From Brazil, 64 Fed. Reg. 8313, 8321 (Dep't Commerce 1999).

In June 1999, Commerce and the Brazilian Government initialed a proposed agreement to suspend the then-ongoing countervailing duty investigation. *See* Suspension Determination, 64 Fed.

---

[3]In addition to Defendant-Intervenors in the case at bar, the petitioners included California Steel Industries, Geneva Steel, Gulf States Steel Inc., the Independent Steelworkers Union, and the United Steelworkers of America. *See* Continued Final Determination, 64 Fed. Reg. 38,742 (Dep't Commerce 1999).

[4]The chronology of the countervailing duty investigation at issue here and the Suspension Agreement entered in that investigation is set forth more fully in Bethlehem Steel Corp. v. United States, 25 CIT ____, 159 F. Supp. 2d 730 (2001).   The parallel chronology of the related antidumping duty investigation and the suspension agreement in that case is detailed in Bethlehem Steel Corp. v. United States, 25 CIT ____, 146 F. Supp. 2d 927 (2001), *dismissed per stipulation*, No. 99-08-00524, 2002 Ct. Int'l Trade LEXIS 36 (CIT Apr. 2, 2002).

Reg. 38,797 (noting June 1999 initialing of proposed suspension agreement). The petitioners filed comments opposing the proposed suspension agreement, but also requested that Commerce continue the investigation in the event that a suspension agreement was executed over their objections. *See* Continued Final Determination, 64 Fed. Reg. 38,742 (Dep't Commerce 1999) (noting petitioners' request for continuation of investigation even if suspension agreement executed).

Commerce and the Brazilian Government signed the Suspension Agreement on July 6, 1999. *See* Suspension Determination, 64 Fed. Reg. 38,797. That same day, Commerce issued its final determination in the underlying countervailing duty investigation, increasing the net subsidy rates slightly to 9.67% for USIMINAS and COSIPA, and decreasing them to 6.35% for CSN and 7.81% for all others. *See* Continued Final Determination, 64 Fed. Reg. at 38,755. The ITC's final determination, issued August 24, 1999, confirmed its preliminary affirmative finding as well. *See* Certain Hot-Rolled Steel Products From Brazil and Russia, 64 Fed. Reg. 46,951 (ITC 1999).

As a result of the Suspension Agreement – which was the subject of Bethlehem Steel, 25 CIT ____, 159 F. Supp. 2d 730, and which remains in effect today – no countervailing duty order has been issued covering hot-rolled steel from Brazil.

## B. Proceedings Before the Court

The Brazilian Exporters timely filed a Summons with the Court, seeking to invoke the Court's jurisdiction under 28 U.S.C. § 1581(c) to contest "certain aspects of the final determination of the International Trade Administration, Department of Commerce, issued in the countervailing duty investigation of Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From Brazil, Inv. No. C-351-829." Summons ¶ 2.

The Complaint, filed one month later, again identified the administrative determination to be reviewed as the "Final Affirmative Countervailing Duty Determination: Certain Hot-Rolled, Flat-Rolled Carbon-Quality Steel Products From Brazil, 64 Fed. Reg. 38,742 (July 19, 1999)." Complaint ¶ 2. The Brazilian Exporters once more invoked the Court's jurisdiction under 28 U.S.C. § 1581(c), and asserted that the action was "commenced under 19 U.S.C. § . . . 1516a(a)(2)(B)(iv)."[5] *Id*. ¶ 3. The Complaint further alleged that Commerce's Continued Final Determination is not supported by substantial evidence on the record and is otherwise not in accordance with law with respect to five specific issues: (1) the methodology for handling pre-privatization subsidies; (2) the treatment of certain equity infusions; (3) the methodology for converting Brazilian *reals* into U.S. dollars; (4) the methodology for calculating repayment in a privatization transaction; and (5) certain aspects of the net countervailable subsidy calculations. *Id*. ¶ 7.

Neither the Summons nor the Complaint challenges any aspect of either Commerce's Suspension Determination or the Suspension Agreement. Nor does either the Summons or the Complaint allege that any changes made in Commerce's Continued Final Determination rendered its Suspension Determination defective in any way. Moreover, the Brazilian Exporters have not challenged the ITC's final determination. Only Commerce's Continued Final Determination is at issue in this case.

## II. Standard of Review

---

[5]The Complaint also referenced 19 U.S.C. § 1516a(2)(A)(i)(I). Complaint ¶ 3. That subsection addresses the time period for commencement of an action in the Court of International Trade, and is not at issue here.

It is axiomatic that " '[t]he United States, as sovereign, is immune from suit save as it consents to be sued . . . , and that the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'" United States v. Mitchell, 445 U.S. 535, 538 (1980) (*quoting* United States v. Sherwood, 312 U.S. 584, 586 (1941) ); *see also* Federal Deposit Ins. Corp. v. Meyer, 510 U.S. 471, 475 (1994) ("[s]overeign immunity is jurisdictional in nature"). A waiver of sovereign immunity " ' cannot be implied but must be unequivocally expressed.' " Mitchell, 445 U.S. at 538 (*quoting* United States v. King, 395 U.S. 1, 4 (1969) ); *see also* Lane v. Pena, 518 U.S. 187, 192 (1996) (waiver of sovereign immunity "must be unequivocally expressed in statutory text" and "will be strictly construed, in terms of its scope, in favor of the sovereign") (citations omitted).

Thus, to the extent that statutory language contains ambiguities concerning the waiver of sovereign immunity, those ambiguities must be construed in favor of immunity. United States v. Williams, 514 U.S. 527, 531 (1995) (*citing* United States v. Nordic Village, Inc., 503 U.S. 30, 33 (1992) ); *see also* Novacor Chems., Inc. v. United States, 171 F.3d 1376, 1382 (Fed. Cir. 1999) ("[w]e must strictly construe the statute, for we may not imply a waiver"); RHI Holdings, Inc. v. United States, 142 F.3d 1459, 1461 (Fed. Cir. 1998) ("[a]ny statute which creates a waiver of sovereign immunity must be strictly construed in favor of the Government") (*citing* Sherwood, 312 U.S. at 590); NEC Corp. v. United States, 806 F.2d 247, 249 (Fed. Cir. 1986) ("[t]he terms of the government's consent to be sued in any particular court define that court's jurisdiction to entertain the suit" (citations omitted) ).

### III. <u>Discussion</u>

"[S]overeign immunity goes to the issue of the court's power to hear the case, and therefore is antecedent to the merits of the case." <u>Humane Soc'y of the U.S. v. Clinton</u>, 236 F.3d 1320, 1326 (Fed. Cir. 2001). To establish jurisdiction here, the Brazilian Exporters must prove that Congress waived the Government's immunity from actions such as this. <u>McNutt v. Gen. Motors Acceptance Corp.</u>, 298 U.S. 178, 188-89 (1936); *see also* <u>Elkem Metals Co. v. United States</u>, 23 CIT 170, 175, 44 F. Supp. 2d 288, 292 (1999) (plaintiff bears burden of pleading and proving facts required for jurisdiction). This they cannot do.

### A. <u>The Language of The Statute</u>

For purposes of this action, the terms of the United States' consent to suit are reflected in subsection (iv) of 19 U.S.C. § 1516a(a)(2)(B), invoked by the Brazilian Exporters' Summons and Complaint and set forth in context below:

(B) Reviewable determinations

The determinations which may be contested under subparagraph (A) are as follows:

> (i)     Final affirmative [antidumping or countervailing duty] determinations . . . *including* any negative part of such a determination . . . .
>
> (ii)     A final negative [antidumping or countervailing duty] determination . . . *including* . . . any part of a final affirmative determination which specifically excludes any company or product.
>
> (iii)     . . .
>
> (iv)     A determination by the administering authority, under section 1671c or 1673c of this title, to suspend an antidumping duty or a countervailing duty investigation, *including* any final determination resulting from a continued investigation which changes the size of the dumping margin or net countervailable subsidy calculated, or the reasoning underlying such calculations, at the time the suspension agreement was concluded.

. . . .

19 U.S.C. § 1516a(a)(2)(B) (1994) (emphases supplied.)

The "subparagraph (A)" referenced in 19 U.S.C. § 1561a(a)(2)(B) sets forth the procedure for challenging an administrative determination reviewable under subparagraph (B). Specifically, subparagraph (A) requires the filing of a summons within thirty days of publication of the determination, followed by a complaint thirty days thereafter. As the U.S. Court of Appeals for the Federal Circuit has explained, that procedure delimits the subject matter jurisdiction of the Court of International Trade. *See* Georgetown Steel Corp. v. United States, 801 F.2d 1308, 1312 (Fed. Cir. 1986) (*citing* Lehman v. Nakshian, 453 U.S. 156, 161 (1981) ) .

In Georgetown Steel, the Court of Appeals held that, since subparagraph (A) "specifies the terms and conditions upon which the United States has waived its sovereign immunity in consenting to be sued in the Court of International Trade, those limitations must be strictly observed and are not subject to implied exceptions. If a litigant fails to comply with the terms upon which the United States has consented to be sued, the court has no 'jurisdiction to entertain the suit.' " Georgetown Steel, 801 F.2d at 1312 (*citing* United States v. Mitchell, 445 U.S. 535, 538 (1980) ). In that case, Georgetown Steel's initial mailing of its complaint was returned for insufficient postage. The Court of Appeals held that the plaintiff's failure to comply with the statutory thirty day deadline for the filing of its complaint deprived the Court of International Trade of subject matter jurisdiction.

The instant case turns on the interpretation of the jurisdictional provision immediately following that at issue in Georgetown Steel, which similarly "specifies the terms and conditions upon which the United States has waived its sovereign immunity." As with subparagraph (A) in

Georgetown Steel, subparagraph (B) here can be interpreted to waive sovereign immunity only if such a waiver has been unequivocally expressed in the statute.

### B.  Dictionary Definitions of "Including"

The Brazilian Exporters' claim to jurisdiction turns largely on the word "including" as it is used in 19 U.S.C. § 1516a(a)(2)(B)(iv).  However, the statute at issue does not define the term. Accordingly, it is to be construed using its established meaning. *See, e.g.*, NLRB v. Amax Coal Co., 453 U.S. 322, 329 (1981) ("[w]here Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms"); *see also* NSK Ltd. v. United States, 115 F.3d 965, 974 (Fed. Cir. 1997) (to the same effect).

To establish the plain meaning of  "including," both the Government and the Brazilian Exporters point to dictionary definitions – but with very different results.  While the Government maintains that the term as used in the statute is "illustrative," the Brazilian Exporters read the term as "conjunctive" or "expansive."

Specifically, the Government relies on Merriam-Webster's Collegiate Dictionary to argue that Congress' use of "including" reflects its intent that a challenge to a continued final determination occur only "as a constituent, component, or subordinate part of a larger whole" – in other words, as part of a challenge to a suspension determination.  Defendant's Memo at 15 (*quoting* Merriam-Webster's Collegiate Dictionary 588 (10th ed. 1999) (definition of "include"), *and citing* Webster's Third New International Dictionary 1143 (1963) ("include" means "to place, list, or rate as a part or component of a whole or of a larger group, class, or aggregate <*included* a sum for tips

in his estimate of expenses>") ). The Government contends that, had Congress intended to permit parties to challenge a continued final determination without challenging the suspension determination, the statute would have authorized challenges to suspension determinations "or" continued final determinations. Instead, according to the Government, Congress chose the word "including," to require that any challenge to a continued final determination be made as a subordinate part of a greater challenge – a challenge to a suspension determination. Defendant's Memo at 15-16.

Relying on Amax Coal, *supra*, and touting Black's Law Dictionary as "[t]he authoritative American legal dictionary," the Brazilian Exporters argue that – for purposes of statutory construction – the "legal" definition of "including" should take precedence over the "non-legal" definitions on which the Government relies. Plaintiffs' Opposition To Defendant's Motion To Dismiss For Lack of Subject Matter Jurisdiction ("Plaintiffs' Opposition") at 6-7. The Brazilian Exporters emphasize that Black's definition of "including" recognizes the "expansive" meaning of the term:

> To confine within, hold as in an enclosure, take in, attain, shut up, contain, enclose, comprise, comprehend, embrace, involve. Term may, according to context, express an enlargement and have the meaning of *and* or *in addition to,* or merely specify a particular thing already included within general words theretofore used. "Including" within a statute is interpreted as a word of enlargement or of illustrative application as well as a word of limitation.

Black's Law Dictionary 763 (6th ed. 1990) (emphasis in original). The Brazilian Exporters therefore conclude that " 'including' can be a word of enlargement, synonymous with 'as well as,' " and that – so read – 19 U.S.C. § 1516a(a)(2)(B)(iv) permits a party to challenge the final determination

resulting from a continued investigation, *as well as* – or *in addition to* – the decision to suspend the investigation.  Plaintiffs' Opposition at 7.

The Brazilian Exporters misread Amax Coal.  That case does not hold that "legal" definitions (such as those in Black's) trump "non-legal" definitions.  Indeed, in NSK Ltd. v. United States, the Court of Appeals quoted the very language from Amax Coal on which the Brazilian Exporters rely, and then placed equal reliance on Webster's Third New International Dictionary and Black's.  NSK Ltd. v. United States, 115 F.3d 965, 974 (Fed. Cir. 1997).[6]

Moreover, in interpreting statutes, the U.S. Supreme Court often relies on non-legal dictionaries.  *See*, *e.g.,* Deal v. United States, 508 U.S. 129, 131-32 (1993) *and* Hartford Fire Ins. Co. v. California, 509 U.S. 764, 781, 801 (1993) (*citing* Webster's New International Dictionary *and* Oxford English Dictionary, *respectively*); *see also* Note, *Looking it up: Dictionaries and Statutory Interpretation*, 107 Harv. L. Rev. 1437, 1447-48 (1994).  In fact, the Supreme Court recently characterized one of the sources which the Government cites – Webster's Third New International Dictionary – as one of  the "most authoritative" dictionaries.  Johnson v. United States, 529 U.S. 694, 706 n.9 (2000).[7]

---

[6] In any event, as the Government observes, the definition in Black's is similar to the definitions in the sources cited by the Government, in that Black's notes that the word "include" derives from the Latin *Inclaudere*, which means "to shut in, keep within."  Defendant's Reply to Plaintiffs' Opposition to Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction ("Defendant's Reply") at 8 (*citing* Black's Law Dictionary 763 (6th ed. 1990) ).  Indeed, even the Brazilian Exporters concede that Black's recognizes the use of "including" in an "illustrative" sense.

[7] The Supreme Court also cited with approval the Oxford English Dictionary, which defines "including" as something "[t]hat includes, shuts in, encloses, or comprises."  VII Oxford English Dictionary 801 (2d ed. 1989).  *See* Johnson, 529 U.S. at 706 n.9.

More to the point, the Brazilian Exporters do not (and cannot) dispute the Government's claim that "including" can be used in a merely "illustrative" sense. *See* Plaintiffs' Opposition at 6 (asserting that the term "is not *always* used in the 'illustrative' sense . . .," and that the Government "fails to acknowledge that the word 'include' can *also* mean . . .") (emphases supplied). Rather, the gravamen of the Brazilian Exporters' argument is that the term "including" sometimes has an "expansive" or "conjunctive" meaning instead. *Id*. (asserting that "The Plain Meaning of 'Including' Is Broader Than Defendant's Selective Dictionary Definitions"). But that is not enough to carry the day.

As discussed in section II above, any ambiguity in the language of the statute must be construed in favor of sovereign immunity. Accordingly, the fact that the term "including" can be used in a merely "illustrative" sense – a fact that the Brazilian Exporters concede – renders any other potential definition irrelevant.

## C.     The Language of § 1516a(a)(2)(B)(iv) As A Whole

The language of 19 U.S.C. § 1516a(a)(2)(B)(iv) as a whole supports the conclusion that challenges to continued final determinations are not permitted in isolation. *See generally* Defendant's Memo at 16-18.

As the Government observes, Congress limited the types of continued final determinations that may be challenged under § 1516a(a)(2)(B)(iv) by "close reference" to the underlying suspension agreement. *See* Defendant's Memo at 18. By the terms of the statute, the only such determination that may be challenged is one "resulting from a continued investigation" that "changes the size of the dumping margin or net countervailable subsidy calculated, or the reasoning underlying such

calculations, at the time the suspension agreement was concluded." 19 U.S.C. § 1516a(a)(2)(B)(iv) (1994).

The focus of § 1516a(a)(2)(B)(iv) is thus on Commerce's determination to suspend the investigation. Judicial review of continued final determinations under § 1516a(a)(2)(B)(iv) is effectively limited to those cases where it is alleged that the assumptions underlying the suspension determination – *i.e.*, Commerce's findings in the preliminary determination – have changed so as to (arguably) render some aspect of the suspension determination defective. As the Government puts it, "it would be absurd and illogical for Congress to limit the types of final determinations that may be challenged by close reference to the underlying suspension agreement and then permit challenges to those same final determinations in isolation, without regard to either the suspension agreement or [the suspension] determination."[8] *See* Defendant's Memo at 18.

_____

[8]In advancing this argument in its opening brief, the Government noted that a challenge to a final determination which resulted from a continued investigation that changed the size of the net countervailable subsidy would permit a party to demonstrate error in a suspension determination based upon acceptance of an agreement under 19 U.S.C. § 1671c(c) – *i.e.*, an agreement offsetting at least 85% of the net countervailable subsidy. Defendant's Memo at 17. While the 85% requirement may be fulfilled at the time the suspension agreement is signed, the continuation of the investigation and the resulting final determination may establish that the 85% requirement is no longer met – for example, because the agency's continued final determination finds a higher net subsidy rate.

The Brazilian Exporters seize upon the Government's example and argue that it does not support the Government's position here because the plaintiff in the hypothetical "would be using the continued final determination as evidence that the determination to suspend the investigation was contrary to law," rather than challenging the legality of the continued final determination. Plaintiffs' Opposition at 14. True enough, a plaintiff could seek to use the continued final determination's higher net subsidy rates to attack the suspension determination. But a plaintiff might also consider the continued final determination's rates themselves erroneous. Thus, the Government postulates, suppose that Commerce preliminarily found a net subsidy rate of 10% and accepted a suspension agreement based upon that 10% rate; but, then, after continuation of the investigation, Commerce's continued final determination found a net subsidy rate of 20%. Defendant's Reply at 11-12. In

D.   The Use of "Including" in Other Parts of § 1516a(a)(2)(B)

The use of the term "including" elsewhere in 19 U.S.C. § 1516a(a)(2)(B) further reinforces the Government's position.

There is a "natural presumption that identical words used in different parts of the same act are intended to have the same meaning." Atlantic Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 433 (1932) (citation omitted). *See also* Helvering v. Stockholms Enskilda Bank, 293 U.S. 84, 87 (1934); Sorenson v. Sec. of the Treasury, 475 U.S. 851, 860 (1986); Sullivan v. Stroop, 496 U.S. 478, 484 (1990); Libbey Glass v. United States, 921 F.2d 1263, 1265 (Fed. Cir. 1990). *See generally* 2A Norman J. Singer, Statutes and Statutory Construction § 46:06 (6th ed. 2000) (noting existence of "presumption that the same words used twice in the same act have the same meaning"). Applying that maxim of statutory construction, the word "including" in § 1516a(a)(2)(B)(iv) should be read in parallel with its use in §§ 1516a(a)(2)(B)(i) and (ii).[9]

As the Brazilian Exporters concede, there is a substantial but subordinate relationship between the agency determination listed *after* "including" and the agency determination listed *before* "including" in both §§ 1516a(a)(2)(B)(i) and (ii); that is, in both of those subsections, "including" is used in an "illustrative" sense, and the determinations listed after "including" must be challenged

---

challenging Commerce's suspension determination, a party could argue that the *increase* in the continued final determination demonstrates the invalidity of Commerce's initial conclusions concerning the amount of the subsidy to be offset by the suspension agreement. But a party could also argue that the 20% rate found in Commerce's continued final determination was too low. Such a plaintiff would be challenging the continued final determination as part of its overall challenge to the suspension determination. *Id*. at 12.

[9]Logically, the maxim has even greater force here, where the term at issue is used not merely within the same statute, but within the same section.

in conjunction with the respective determinations that precede the term.  *See* Plaintiffs' Opposition at 7-11.

The structure of § 1516a(a)(2)(B)(iv) is substantially the same.  In that subsection – as in §§ 1516a(a)(2)(B)(i) and (ii) – the determination after the word "including" is subsidiary to the determination that precedes "including."[10] Thus, under § 1516a(a)(2)(B)(iv), any challenge to a final determination resulting from a continued investigation that changes the size of the net countervailable subsidy must be made in conjunction with a challenge to a suspension determination.  A final determination resulting from a continued investigation cannot be challenged in isolation.

### E.  The Legislative History of § 1516a(a)(2)(B)(iv)

The Brazilian Exporters contend that the legislative history of 19 U.S.C. § 1516a(a)(2)(B)(iv) supports their claim of jurisdiction.  Specifically, they argue that the purpose of adding the "including" clause to that subsection was to preclude appeals to the Court before a final agency determination, thus eliminating piecemeal litigation.  Plaintiffs' Opposition at 11-13; *see also* Defendant's Memo at 13 *and* Defendant's Reply at 14-15, including authorities cited there.  Asserting that this case does not raise any issues related to interlocutory appeals, the Brazilian Exporters suggest that the action does not contravene Congressional intent.

---

[10]The Brazilian Exporters attempt to distinguish § 1516a(a)(2)(B)(iv) by arguing that, in §§ 1516a(a)(2)(B)(i) and (ii), the determination that follows the word "including" is itself a component part of the determination that precedes that word.  To the contrary, a final antidumping determination by Commerce excluding certain companies cannot be said to be a part of a subsequent negative injury determination by the ITC.  *See* 19 U.S.C. § 1516a(a)(2)(B)(ii) (1994).

But the Brazilian Exporters paint with too broad a brush. A continued final affirmative determination has no practical effect, unless and until the related suspension agreement is dissolved – at the wish of the foreign party, or because the agreement is successfully attacked under § 1516a(a)(2)(B)(iv), or because Commerce determines that a signatory has violated it under 19 U.S.C. § 1671c(i). Thus, many of the same jurisprudential concerns that militate against piecemeal litigation also weigh against litigation of a challenge such as that advanced by the Brazilian Exporters here – a challenge which is not yet (and may never be) ripe.

In any event, as the Government notes, it is immaterial whether or not this action implicates the concerns over interlocutory appeals reflected in the legislative history of the statute. *See* Defendant's Reply at 15-16. The language of the statute is paramount, and this action conflicts with the limited waiver of sovereign immunity found in the statute itself.

## F.  19 U.S.C. § 1671c(f)(3)

The Brazilian Exporters also point to "the architecture of the suspension agreement statute" – particularly 19 U.S.C. § 1671c(f)(3) – as evidence that Congress intended to allow challenges to continued final determinations in isolation from related suspension determinations. According to the Brazilian Exporters, the Government's reading of § 1516a(a)(2)(B)(iv) would render § 1671c(f)(3) "meaningless." Plaintiff's Opposition at 14-15.

Invoking § 1671c(f)(3)(A), the Brazilian Exporters emphasize that the viability of a suspension agreement depends upon a legally valid affirmative determination. *Id*. at 14-16. That subsection provides that, if the results of a continued final determination are negative, "the suspension agreement shall have no force or effect and the investigation shall be terminated."

According to the Brazilian Exporters, that provision is rendered meaningless unless the legal validity of a continued final affirmative determination can be challenged in court. *Id*. at 15.

But the Brazilian Exporters' reliance on § 1671c(f)(3)(A) is misplaced. Contrary to their claim, it does not follow that a continued final affirmative determination is subject to judicial review pursuant to § 1516a(a)(2)(B)(iv) independently of a challenge to the related suspension agreement. A party that takes the position that a suspension agreement should have no force and effect because Commerce should have made a final negative determination need only seek judicial review under § 1516a(a)(2)(B)(iv). In other words, the party need only challenge the suspension determination and the continued final determination at the same time.

The Brazilian Exporters' reliance on 19 U.S.C. § 1671c(f)(3)(B) is similarly unavailing. Under that section, no countervailing duty order issues – notwithstanding a continued final affirmative determination – provided that the suspension agreement continues to remain in force and to meet all relevant requirements, and provided that the parties comply with the terms of the agreement. The Brazilian Exporters apparently contend that Congress intended that parties be able to seek judicial review of a continued final determination without challenging the suspension determination in order to ensure that the agreement continues to meet the requirements of the statute. Plaintiffs' Opposition at 16-17.

However, the statute provides elsewhere for annual administrative reviews to "review the current status of, and compliance with" suspension agreements and to "review the amount of any net countervailable subsidy . . . involved in the agreement[s]." 19 U.S.C. § 1675(a)(1)(C) (1994); *see generally* Elkem Metals Co. v. United States, 23 CIT 170, 44 F. Supp. 2d 288 (1999) (noting

availability of Commerce review of compliance with suspension agreement, with results subject to judicial review under 19 U.S.C. § 1516a(a)(2)(B)(iii)).  There is thus no need to read into § 1516a(a)(2)(B)(iv) some right to independently challenge a continued final determination in order to ensure that a suspension agreement continues to meet statutory requirements.

### G.  The Brazilian Exporters' Asserted "Perpetual Choice"

The Brazilian Exporters' final argument is predicated on their claim that the suspension agreement statute was designed to accord responding governments a "perpetual choice" between a suspension agreement and a continued final determination.  Plaintiffs' Opposition at 17-21.  Characterizing a suspension agreement as "a voluntary alternative to an order," the Brazilian Exporters assert that "the purpose of the suspension agreement is to allow . . . the responding government[ ] to have the option of deciding, at any given moment, whether to pursue the suspension agreement or abandon the suspension agreement and have an order based on a final determination."  *Id*. at 18.[11]  The Brazilian Exporters maintain that a right to immediate judicial review of the validity of a continued final determination is necessary to ensure that, in weighing its options in the  exercise of its "perpetual choice," a responding government can make an informed

---

[11]The Brazilian Exporters actually contend that a suspension agreement "may be terminated at any time by either *the U.S. government* or the Respondent government."  Plaintiffs' Opposition at 17-18 (emphasis supplied).  *See also id*. at 18 ("the purpose of the suspension agreement is to allow *the U.S. government*, as well as the responding government, to have the option of deciding, at any given moment, whether to pursue the suspension agreement or abandon the suspension agreement") (emphasis supplied).  But the Brazilian Exporters appear to be mistaken.  While Section XI of the Suspension Agreement provides that the Government of Brazil may terminate the agreement at any time, nothing in the agreement gives the U.S. Government the same right.  *See* Suspension Determination, 64 Fed. Reg. 38,797.

decision based on full knowledge of the precise consequences of a decision to abandon the suspension agreement.  *Id*. at 19.

However, the fundamental premise of this argument is faulty.  Nothing in either the language of the statute or its legislative history evinces any concern on the part of Congress with ensuring such a "perpetual choice."  Indeed, the legislative history indicates that the suspension agreement statute was drafted not for the benefit of respondent government signatories, but rather to serve "the interest of the public and the domestic industry affected."  S. Rep. No. 96-249 at 71, *reprinted in* 1979 U.S.C.C.A.N. 381, 457.

Nor is there any merit to the concern that denying the right to immediately challenge a continued final determination in isolation will effectively insulate that determination from judicial review.  *See* Plaintiffs' Opposition at 18, 20-21.  A signatory's withdrawal from a suspension agreement would trigger 19 U.S.C. § 1671c(i).  Under that provision of the statute, where – as here – the investigation had already been completed, Commerce would issue a countervailing duty order.  Within thirty days after <u>Federal Register</u> publication of the order, any interested party who was a party to the proceeding could contest Commerce's final affirmative determination.  19 U.S.C. § 1516a(a)(2) (1994).

In short, contrary to the implication of the Brazilian Exporters' argument,  the statute does indeed provide for meaningful judicial review of continued final determinations – albeit not immediately and not "in the manner . . . most convenient to signatories."  *See* Defendant's Reply at 19.

## IV.  <u>Conclusion</u>

The Brazilian Exporters have failed to meet their burden of establishing the jurisdiction of the Court.  They essentially concede that the precise statutory language at issue *can* be read to preclude their challenge of the continued final determination unless they also challenge the underlying suspension agreement.  It  is axiomatic that any ambiguities concerning a waiver of sovereign immunity must be construed in favor of immunity.

For all the reasons set forth above, the Court lacks subject matter jurisdiction over this action.  Accordingly, it must be dismissed.

_____

Delissa A. Ridgway
Judge

Decided:   April 19, 2002
                New York, New York