# United States Court of Appeals for the Federal Circuit

---

**RED SUN FARMS,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES, FLORIDA TOMATO EXCHANGE,**
*Defendants-Appellees*

---

2020-2230

---

Appeal from the United States Court of International Trade in No. 1:19-cv-00205-JCG, Judge Jennifer Choe-Groves.

---

Decided: April 14, 2022

---

JAMES P. DURLING, Curtis, Mallet-Prevost, Colt & Mosle LLP, Washington, DC, argued for plaintiff-appellant. Also represented by JAMES BEATY, DANIEL L. PORTER. Also argued by DEVIN S. SIKES, Akin Gump Strauss Hauer & Feld LLP, Washington, DC; JEFFREY M. WINTON, Winton & Chapman, PLLC, Washington, DC.

DOUGLAS GLENN EDELSCHICK, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also argued by ROBERT K. KIEPURA. Also represented by BRIAN M. BOYNTON, JEANNE DAVIDSON,

FRANKLIN E. WHITE, JR.; EMMA T. HUNTER, Office of the Chief Counsel for Trade Enforcement & Compliance, United States Department of Commerce, Washington, DC.

MARY JANE ALVES, Cassidy Levy Kent USA LLP, Washington, DC, argued for defendant-appellee Florida Tomato Exchange. Also represented by JAMES R. CANNON, JR., ULRIKA K. SWANSON, JONATHAN M. ZIELINSKI.

————————————

Before DYK, PROST, and TARANTO, *Circuit Judges.*

Opinion for the Court filed by *Circuit Judge* TARANTO.

Opinion dissenting-in-part and concurring-in-part filed by *Circuit Judge* DYK.

TARANTO, *Circuit Judge.*

This is one of several appeals argued together to this panel, all arising out of an antidumping duty investigation to determine whether fresh Mexican tomatoes were being imported into the United States and sold at less than fair value. The history of the proceedings is described in our two accompanying precedential opinions in *Confederacion de Asociaciones Agricolas del Estado de Sinaloa, A.C. v. United States*, No. 2020-2232, and *Bioparques de Occidente v. United States*, No. 2020-2265. In this case, we reverse and remand.

I

A

"Red Sun Farms" is the trade name under which various identified entities do business. These entities are "U.S. producers of fresh tomatoes grown in the United States, U.S. importers and resellers of fresh tomatoes from Mexico, and foreign producers and exporters of fresh tomatoes from Mexico." Appellant's Br. 3; *see also* J.A. 21 (summons).

The complaint in this case was filed against the United States in the Court of International Trade ("Trade Court") on December 26, 2019. It begins: "1. Plaintiff Red Sun Farms (Naturbell SPR DE RL, San Miguel Red Sun Farms SPR DE RL DE CV, Agricola El Rosal SA DE, Jem D International Michigan Inc., and Red Sun Farms Virginia LLC, collectively d/b/a Red Sun Farms) by and through its counsel, states the following claims against the Defendant, the United States." J.A. 24. The caption on the complaint is simply "Red Sun Farms, Plaintiff, v. United States, Defendant." *Id.* After beginning with the identification of "Red Sun Farms" with the above quote, the complaint thereafter uses the singular "Plaintiff." *See* J.A. 24–36. Like the Trade Court, we will follow that usage—which, however, raises issues to be addressed on remand, as we will discuss.

The complaint followed the filing, on November 25, 2019, of the summons that commenced the Trade Court case. J.A. 21–23. The summons includes the same caption and formulation relating "Red Sun Farms" to five identified entities as does the later complaint, but the summons, while twice referring to "Plaintiff" (singular), also twice refers to "Plaintiffs" (plural). J.A. 21. The corporate disclosure statement filed with the summons states: "Plaintiff and its member companies are not publicly-owned." Form 13 Corporate Disclosure Statement, *Red Sun Farms v. United States*, No. 1:19-cv-00205 (Ct. Int'l Trade Nov. 25, 2019), ECF No. 3.

In the Trade Court, the government flagged the issue of who precisely brought this action. In its March 2020 motion to dismiss, the government observed, with respect to the five identified entities doing business as "Red Sun Farms," that "[i]t is unclear whether all of these parties possess standing or can be considered real parties in interest" and reserved its right to raise additional arguments on the subject. J.A. 62 n.1. In April 2020, in a discovery filing,

the government noted the varying singular/plural usage by Red Sun Farms and stated that "'Plaintiff' Red Sun Farms actually consists of several companies, which are" the five identified in the quote above. J.A. 180 n.1. We note that, in this court, Red Sun Farms, in its certificate of interest (Form 9 in this court), used the same formulation quoted above from the complaint, *i.e.*, "Red Sun Farms ([the identified five entities], collectively d/b/a Red Sun Farms)," to designate "all entities represented by the undersigned counsel in this case." Certificate of Interest, *Red Sun Farms v. United States*, No. 2020-2230 (Fed. Cir. Sept. 16, 2020), ECF No. 3.

B

On the merits, Red Sun Farms presented seven claims in the complaint. All claims challenge aspects of the final determination resulting from Commerce's continued investigation. *See* Fresh Tomatoes from Mexico: Final Determination of Sales at Less than Fair Value, 84 Fed. Reg. 57,401 (Oct. 25, 2019) (*Final Determination*). The claims fall into three categories: (1) that Commerce improperly selected new respondents in its continued investigation; (2) that Commerce committed timing and procedural errors in reaching its final determination; and (3) that Commerce utilized flawed methodologies to calculate dumping margins, the all-others rate, and cash deposit rates in the final determination. Red Sun Farms alleged in the complaint that the Trade Court had jurisdiction under 28 U.S.C. § 1581(c) because Red Sun Farms challenged a final determination resulting from a continued investigation under 19 U.S.C. § 1516a(a)(2)(B)(iv).

The government moved to dismiss on grounds of ripeness, lack of subject matter jurisdiction, and failure to state a claim upon which relief can be granted. The Trade Court granted the government's motion and dismissed the complaint with prejudice on ripeness grounds because the 2019

suspension agreement remained in place, and there had been accordingly no final antidumping order issued based on the *Final Determination*. *Red Sun Farms v. United States*, 469 F. Supp. 3d 1403, 1408–10 (Ct. Int'l Trade 2020). Red Sun Farms appeals. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## II

Like the appellants in *Bioparques de Occidente v. United States*, No. 2020-2265 [hereafter "*Bioparques*"], Red Sun Farms challenges the *Final Determination* published by the Department of Commerce on October 25, 2019. The Trade Court held in this case, as it did in the *Bioparques* case, that these challenges were premature because no final antidumping order had issued. Today we reverse that holding in *Bioparques*, and we do the same in this case, relying on our opinion in *Bioparques*—which applies because Red Sun Farms' interests include the present, concrete interests of exporters bound by the suspension agreement at the center of *Bioparques*. Red Sun Farms' claims are not premature.

As to statutory jurisdiction, this case differs from *Bioparques*. There, we hold that jurisdiction exists based on §§ 1516a(g)(3)(A)(i) and 1516a(a)(2)(B)(i); and we do not reach the issue of jurisdiction based on §§ 1516a(a)(2)(A)(i) and 1516a(a)(2)(B)(iv). Here, Red Sun Farms invokes only the latter basis of statutory jurisdiction. We hold, in agreement with Red Sun Farms, that the Trade Court has statutory jurisdiction on that basis.

## A

Under § 1516a(a)(2)(A)(i)(I), "[w]ithin thirty days after . . . the date of publication in the Federal Register of . . . notice of *any* determination described in clause . . . (iv) . . . of subparagraph (B)," "an interested party who is a party to the proceeding in connection with which the matter

arises may commence an action" in the Trade Court by filing a summons, to be followed by a complaint within 30 days thereafter (emphasis added).  Clause (iv) of subparagraph (B) reads:

> (B) Reviewable determinations
>
> The determinations which may be contested under subparagraph (A) are as follows:
>
> * * *
>
> (iv) A determination by the administering authority, under section 1671c or 1673c of this title, to suspend an antidumping duty or a countervailing duty investigation, including any final determination resulting from a continued investigation which changes the size of the dumping margin or net countervailable subsidy calculated, or the reasoning underlying such calculations, at the time the suspension agreement was concluded.

§ 1516a(a)(2)(B)(iv) [hereafter "B(iv)"].  As explained in *Bioparques*, § 1673c covers agreements to suspend an investigation, § 1673c(c); continued investigations, § 1673c(f)(3); and procedures relating to final determinations in those continued investigations, *id.*  As also explained in *Bioparques*, Congress gave not only domestic-industry entities but also the exporter signatories (if they are significant enough together) the right to demand a continued investigation after publication of a suspension agreement. § 1673c(g).  *See Bioparques*, slip op. at 17.

The government agrees that Commerce's *Final Determination* in the present matter is a "final determination resulting from a continued investigation which changes the size of the dumping margin."  Oral Arg. at 1:22:40–1:23:02; *see also* Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Fresh Tomatoes From Mexico, 61 Fed. Reg. 56,608,

56,615 (Nov. 1, 1996) (*Preliminary Determination*) (setting preliminary dumping margins); *Final Determination*, 84 Fed. Reg. at 57,402 (changing the size of those margins). And the government does not dispute that Red Sun Farms served its summons within 30 days of publication of the *Final Determination* and served its complaint within 30 days thereafter. The government nevertheless disputes the applicability of B(iv).

The government's argument is that any challenge under B(iv) must include a timely challenge to the suspension agreement itself—to a "determination by" Commerce "to suspend an antidumping duty . . . investigation." § 1516a(a)(2)(B)(iv). According to the government, even if the challenger's only grievance is with the final determination in the continued investigation, it cannot challenge that final determination under B(iv) unless it filed an action within 30 days of the publication of the suspension agreement at issue. It is not enough, says the government, that the challenger filed its B(iv) action within 30 days of the publication of the final determination that follows that agreement. In this matter, it is undisputed that Red Sun Farms did not file an action within 30 days of publication of the 2019 Agreement.

We have not ruled on the proper interpretation of B(iv), so the government bases its argument on *Usinas Siderúrgicas de Minas Gerais, S/A v. United States*, 201 F. Supp. 2d 1304 (Ct. Int'l Trade 2002). There, the Trade Court concluded that B(iv) covers only actions that allege that the suspension agreement should not have been executed or that it is defective in light of a final determination's alteration of margins or reasoning underlying the agreement, and it determined that B(iv) actions must be brought within 30 days of publication of the suspension agreement. *Id.* at 1312. The *Usinas* court reasoned that the statute, through its "including" language, "close[ly] reference[s]" the underlying suspension agreement, so that a challenge

to the final determination can be brought only as part of a challenge to the suspension agreement itself. *Id.*

*Usinas* is not precedent for this court, and we conclude that the *Usinas* court read B(iv) too narrowly. A final determination in a continued investigation that changes the dumping margins after the conclusion of the suspension agreement, like the *Final Determination* here, is a "determination described in clause . . . (iv) . . . of subparagraph (B)." § 1516a(a)(2)(A)(i). And "any" such determination may be reviewed by filing a summons within 30 days of that determination's publication (followed by a complaint within 30 days thereafter). *Id.* The language of subparagraph (A) directly applies to these types of determinations, in which Commerce's calculation of dumping margins has changed, creating a different set of circumstances from those on which the suspension agreement was based.

The language of B(iv), on which the *Usinas* court relied, does not support a contrary conclusion. The court in *Usinas*, agreeing with the government, ruled that the "including" term could have (and therefore had to be given) a meaning under which the words following "including" identify a component part of what is identified in the words preceding "including." *Usinas*, 201 F. Supp. 2d at 1310–13 (using "illustrative," "component part," and similar terms to identify this interpretation). But that meaning makes no linguistic sense in B(iv). A final determination in a continued investigation is not naturally described as a part of a "determination . . . to suspend"; they are not even made at the same time or in the same Commerce document or announcement. Indeed, the particular final determinations identified in B(iv) qualify only if they embody *changes* in the premises of the earlier-made "determination . . . to suspend." A whole/part meaning makes no sense in B(iv), unlike in B(i) or B(ii), which refer to a final affirmative determination as including a negative "part" (and vice versa)

of the single Commerce announcement, with no gap in time of publication.

As the court in *Usinas* recognized, "including" in legal settings can have an "expansive" meaning, 201 F. Supp. 2d at 1311, under which a provision as a whole encompasses both what comes before and what comes after the word. Here, such a meaning is supported by the language with which subparagraph B begins: "The determinations which may be contested under subparagraph (A) clause are as follows . . . ." The "including" phrase of B(iv) is naturally understood as identifying something as being "includ[ed]" among the "determinations which may be contested under subparagraph (A)," not (unnaturally) as "includ[ed]" within the "determination . . . to suspend." Accordingly, not only the text of subparagraph (A) but also the text of subparagraph (B) supports Red Sun Farms' interpretation.

This interpretation also fits with other pertinent aspects of the statute. *See, e.g.*, *Merit Mgmt. Group, LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 892–93 (2018) (considering "[t]he language of [the provision at issue], the specific context in which that language is used, and the broader statutory structure"). Congress expressly authorized both domestic-industry entities and exporter signatories (the latter if significant enough together) to trigger a continued investigation, § 1673c(g), and the disputed "including" clause of B(iv) specifically refers to final determinations resulting from such continued investigations that change the premises existing when the suspension agreement was executed. The B(iv) provision thus clearly contemplates a scenario (among others) in which exporter signatories, having just signed the suspension agreement, are interested *only* in obtaining a correct final determination—whether to give them a reason to withdraw from the agreement or, conversely, to avoid termination of a satisfactory suspension agreement because it is deemed not to adhere to

statutory requirements based on a new incorrect final determination (*e.g.*, of higher dumping margins).

The government argues that the Mexican signatories could have challenged the suspension agreement within 30 days of its publication and that such a challenge would have served as a placeholder, allowing them to amend their complaints later to challenge a final determination in the continued investigation once such a final determination was published. Oral Arg. at 1:38:42–1:40:10. But the question is not what could be done, but what must be done. And not only does the government's interpretation conflict with the text of the statute, as just discussed, but the government has not identified any reason why Congress should be understood to have imposed such a placeholder-filing requirement when the interested party is not yet aggrieved by anything and will become aggrieved only later if it sees flaws in a final determination that are worth trying to correct through litigation. Nor has the government identified any support in the legislative history; in fact, no party has presented to us any argument based on legislative history.

The filing requirement urged by the government also would be an awkward fit with the timing requirements of the statute. The government's interpretation would require parties that *might* later want to challenge a final determination in a continued investigation—without even knowing the results of that determination—to file a challenge to the suspension agreement within 30 days of the agreement's publication. Of course, it is conceivable that a final determination might issue within that very brief period, despite the work needed to resume an investigation that has been suspended and arrive at a final determination. But the government has supplied no sound basis for concluding that Congress was acting on the assumption that a final determination would issue in that period or otherwise in time for it to be evaluated before the end of the 30-day period from the publication of the suspension

agreement.  Indeed, Congress allowed for 20 days after the publication of a suspension agreement for domestic-industry entities or exporter signatories just to file a request for continued investigation, § 1673c(g), and for 75 days after the preliminary determination for Commerce to make a final determination, which may be further extended to 135 days, *see* § 1673d(a)(1)–(2).  Here, the *Final Determination* was published on October 25, 2019, which is 31 days after the September 24, 2019 publication of the suspension agreement.  *Final Determination*, 84 Fed. Reg. at 57,402 n.8.  Red Sun Farms did not know the results of the continued investigation, let alone have time to evaluate it, within 30 days of the agreement's publication.

We hold that an affirmative final determination in a continued investigation may be challenged under § 1516a(a)(2)(A)(i)(I) within 30 days of the publication of the final determination under § 1516a(a)(2)(B)(iv), which provides the Trade Court jurisdiction under 28 U.S.C. § 1581(c).  On the record before us, those provisions support Trade Court jurisdiction over Red Sun Farms' challenge to the *Final Determination*.  The dismissal must therefore be reversed, and the case remanded.

B

On remand, the Trade Court should address issues raised by the naming of "Red Sun Farms" as the lone "Plaintiff" in the caption of the case.  The summons and complaint use "Red Sun Farms" as the collective litigation name of the group of the five identified domestic and foreign producers, exporters, and importers, which, the filings assert, use "Red Sun Farms" as their trade name in conducting business; but the summons also refers to the five companies as "Plaintiffs."  We note here some issues raised by these facts, and the others recited above.  We do not decide which ones need to be addressed and resolved on

remand, whether other issues need to be addressed and resolved, and what consequences might follow.

One issue is whether the five entities doing business under the Red Sun Farms name are actually already plaintiffs in this case and should be named in the caption. If so, the question might arise whether some of the five entities (for example, perhaps the domestic producers) might lack standing. If the five entities are not yet parties, a question might arise whether they can be made parties.

Another issue is whether Red Sun Farms is itself an entity with legal capacity to sue. USCIT Rule 17(b)(3) states that for non-corporations, capacity to sue is determined "by the law of the appropriate state, except that . . . a partnership or other unincorporated association with no such capacity under that state's law may sue or be sued in its common name to enforce a substantive right existing under the United States Constitution or laws." Regarding the first clause, state law appears to differ on use of a trade name when bringing suit. *Compare, e.g.*, *America's Wholesale Lender v. Pagano*, 866 A.2d 698, 700 (Conn. App. Ct. 2005) ("Because the trade name of a legal entity does not have a separate legal existence, a plaintiff bringing an action solely in a trade name cannot confer jurisdiction on the court."), *with Sam's Wholesale Club v. Riley*, 527 S.E.2d 293, 296 (Ga. Ct. App. 1999) ("A corporation conducting business in a trade name may sue or be sued in [its] trade name." (quoting *Carrier Transicold Div. v. Southeast Appraisal Resource Assocs.*, 504 S.E.2d 25, 26 (Ga. Ct. App. 1998)). If Red Sun Farms lacks capacity to sue under appropriate state law, the question arises whether it has capacity to sue under the "except that" clause of USCIT Rule 17(b)(3) as a partnership or other unincorporated association suing to enforce substantive rights under Title 19 of the U.S. Code. We note, finally, that if capacity to sue is missing, a question could arise about whether the defect is jurisdictional. *See generally* 6A Charles Alan Wright &

Arthur R. Miller, *Federal Practice and Procedure* § 1559 (3d ed.).

## III

We reverse the Trade Court's decision and remand for further proceedings consistent with this opinion and our decision in *Bioparques*.

The parties shall bear their own costs.

**REVERSED AND REMANDED**

# United States Court of Appeals
# for the Federal Circuit

---

**RED SUN FARMS,**

*Plaintiff-Appellant*

**v.**

**UNITED STATES, FLORIDA TOMATO EXCHANGE,**

*Defendants-Appellees*

---

2020-2230

---

Appeal from the United States Court of International Trade in No. 1:19-cv-00205-JCG, Judge Jennifer Choe-Groves.

---

DYK, *Circuit Judge*, concurring-in-part and dissenting-in-part.

I join part II.B of the majority opinion, but I respectfully dissent from the majority's holding that 19 U.S.C. § 1516a(a)(2)(B)(iv) ("B(iv)") provides a basis for jurisdiction. Subsection B(iv) on its face, in the context of the statute as a whole, and given its history, permits challenges to a final determination resulting from a continued investigation only if the appealing party has previously filed a challenge to the suspension agreement. Both the Trade Court in *Usinas Siderúrgicas de Minas Gerais, S/A v. United States*, 201 F. Supp. 2d 1304 (Ct. Int'l Trade 2002), which has "expertise in addressing antidumping issues and deals on a daily basis with the practical aspects of trade

practice," *Int'l Trading Co. v. United States*, 281 F.3d 1268, 1274 (Fed. Cir. 2002), and the government on appeal agree.

## I

Subsection B(iv) was originally enacted in 1979. The Trade Agreements Act of 1979 for the first time permitted Commerce to enter into suspension agreements, *see* S. Rep. 96-249, at 67–68 (1979), and provided for judicial review of such agreements in subsection B(iv), *see* Pub. L. No. 96-39, § 1001, 93 Stat. 144, 301 (1979). Congress "narrowly circumscribed" Commerce's "authority" to enter into suspension agreements, S. Rep. 96-249, at 71, allowing only those agreements that were "in the public interest, [could] be effectively monitored by the United States, and me[t] specific criteria," *id.* at 68. In particular, the statute authorized agreements that "eliminate[d] completely the injurious effect of exports to the United States of [the subject] merchandise," but only so long as Commerce could show:

> (A) the suppression or undercutting of price levels of domestic products by imports of that merchandise will be prevented, and

> (B) for each entry of each exporter the amount by which the estimated foreign market value exceeds the United States price will not exceed 15 percent of the weighted average amount by which the estimated foreign market value exceeded the United States price for all less-than-fair-value entries of the exporter examined during the course of the investigation.

19 U.S.C. § 1673c(c)(1)(A), (B). These provisions reflected Congress's desire to allow Commerce to enter into suspension agreements eliminating the injurious effects of exports—the type of agreement at issue here—only when the agreement remedied price discrimination determined to exist in antidumping proceedings, thus "serv[ing] the interest[s] of the public and the domestic industry affected." S. Rep. 96-249, at 71.

To ensure such symmetry, Congress required Commerce to publish its affirmative preliminary dumping determination together with the suspension agreement, making issuance of a preliminary determination prerequisite to Commerce's suspension decision. *See* § 1673c(f)(1)(A) ("If the administering authority determines to suspend an investigation . . . it shall . . . publish notice of [the] suspension . . . and issue an affirmative preliminary determination . . . with respect to the subject merchandise, unless it has previously issued such a determination in the same investigation."); *see also* S. Rep. No. 96-249, at 68 ("Upon accepting an agreement, [Commerce] would publish notice in the Federal Register of the suspension together with notice of an affirmative preliminary determination, unless such a determination has already been made during an investigation.").

If a suspension agreement were alleged to be inconsistent with any of the statutory requirements, Congress provided interested parties two routes to challenge the agreement—either in an administrative proceeding before the International Trade Commission ("ITC"), *see* § 1673c(h)(1), or in the Trade Court under subsection B(iv). Given that the statutory grounds for challenging suspension agreements were failure to remedy discrimination, it appears likely that Congress primarily contemplated challenges to agreements by domestic producers. As originally enacted, subsection B(iv) authorized Trade Court review of suspension agreements by providing:

(B) Reviewable determinations

The determinations which may be contested under subparagraph (A) are as follows:

* * *

A determination by the administering authority, under section [1671c or 1673c] of this Act, to suspend an antidumping duty or a countervailing duty investigation.

93 Stat. at 301.

The statute was amended in 1984 to incorporate the underlined language:

(B) Reviewable determinations

The determinations which may be contested under subparagraph (A) are as follows:

* * *

(iv) A determination by the administering authority, under section [1671c or 1673c] of this title, to suspend an antidumping duty or a countervailing duty investigation, <u>including any final determination resulting from a continued investigation which changes the size of the dumping margin or net subsidy calculated, or the reasoning underlying such calculations, at the time the suspension agreement was concluded.</u>

Pub. L. No. 98-573, § 623, 98 Stat. 2948, 3041 (1984) (emphasis added).

## II

The genesis of the 1984 amendment is clear enough. Subsection B(iv) as originally enacted did not account for the fact that the 1979 version of § 1673c permitted suspended investigations to be continued within 20 days of a suspension agreement's publication at the request of (1) the foreign exporter-subjects, or (2) domestic industries and related labor unions, trade, and business associations, *see* 93 Stat. at 168; § 1673c(f)(3), (g), and that these final determinations might affect the validity of the suspension agreement. For example, continued investigations and their resulting final determinations could give rise to situations in which a final determination reduced the dumping margin so that the domestic producers' grounds for challenging the suspension agreement were eliminated, giving

rise to a problem that could be resolved by appealing the final determination.

Congress accordingly amended subsection B(iv) to permit challenges in the same proceeding to the suspension agreement and the final determination, incorporating the "including" language at issue here. The connection between the final determination and the suspension agreement is evident from the language of the provision itself. The amendment did not enable the Trade Court's review of all final determinations—it limited review only to those final determinations that altered the size of the dumping margins (or reasoning) in effect at the time of the suspension agreement's execution. It permitted parties to challenge the changes reflected in the final determination, for example a higher or lower dumping margin that might affect the validity of the suspension agreement. Since a final determination does not go into effect until it is embodied in an antidumping order, the only purpose of allowing a challenge to the final determination before that order issues is because the final determination could affect the suspension agreement. The Trade Court in *Usinas* reached the same conclusion:

> The focus of [subsection B(iv)] is thus on Commerce's determination to suspend the investigation. Judicial review . . . is effectively limited to those cases where it is alleged that the assumptions underlying the suspension determination— i.e., Commerce's findings in the preliminary determination—have changed so as to (arguably) render some aspect of the suspension determination defective.

201 F. Supp. 2d at 1312.

It is difficult to think that subsection B(iv) was designed to enable an importer to challenge the final dumping margin so that it could decide whether to withdraw from a suspension agreement. The legislative history

discloses no such purpose, and the entire focus of the Congressional concern was with agreements that failed to sufficiently remedy dumping, not with agreements that were overly restrictive.

## III

Nonetheless, the majority holds that a party with standing to bring a subsection B(iv) action may challenge the final determination resulting from a continued investigation without first challenging the suspension agreement itself. Maj. Op. 11. As discussed above, the language and history of the statute contradict any such notion. While it is true that depending on context, the term "including" may be expansive, nothing here suggests that Congress intended a reading that would allow freestanding challenges to a final determination unrelated to the suspension agreement itself. To the contrary, Congress limited the types of challenges that can be brought to these determinations "by 'close reference' to the underlying suspension agreement." *Usinas*, 201 F. Supp. 2d at 430.

The majority also suggests that the statute's use of the word "determinations" in describing "[t]he determinations which may be contested under subparagraph (A)," shows that it would be "unnatural[]" to read subsection B(iv)'s including clause as being limited to the "determination . . . to suspend." Maj. Op. 9. But the use of the word "determinations" in the introductory language simply refers to the multiple determinations listed in subsections B(i)–(viii), it does not show that subsection B(iv) contains multiple independently-challengeable determinations.

So too, nothing in § 1516a(a)(2)(A)'s timing requirements supports the majority's approach. The statute requires that a party seeking to challenge a suspension agreement file a summons "[w]ithin thirty days after" publication of "notice of any determination described in [subsection B(iv)]," § 1516a(a)(2)(A), a provision included in the 1979 version of the statute, *see* 93 Stat. at 301. The

majority contends that interpreting subsection B(iv) to require a challenge to the final determination within 30 days of the suspension agreement presents an "awkward fit" because parties seeking to challenge a final determination in a continued investigation will not "know the results of the continued investigation, let alone have time to evaluate it, within 30 days of the agreement's publication." Maj. Op. 10, 11. But there is no awkward fit. A final determination reached after a continued investigation necessarily postdates the publication of a suspension agreement. The statute's requirement that parties file a summons "[w]ithin thirty days after" publication of "notice of any determination described in [subsection B(iv)]" simply means that an interested party must first challenge the agreement for failing to satisfy the statutory requirements within 30 days of its publication, and may later amend that complaint to challenge the final determination. To be sure, domestic producers or importers might like to know the outcome of the final determination in deciding whether to challenge the suspension agreement. But under either the majority's reading of the statute or my reading, it is simply too late to challenge the suspension agreement if it has been more than 30 days since the agreement's publication.

For these reasons, I would refrain from holding that the Trade Court has jurisdiction under § 1516a(a)(2)(B)(iv) to hear Red Sun Farms' claims and would affirm the decision of the Trade Court.[1]

---

[1]   Having relied on jurisdiction under subsection B(iv), Red Sun Farms cannot amend its complaint to allege jurisdiction under subsection B(i) because it did not timely comply with the NAFTA notice requirements under § 1516a(g)(3)(B).